# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

## No. ACM 36785 (reh)

———————————

### UNITED STATES
*Appellee*

**v.**

### Andrew P. WITT
Senior Airman (E-4), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 19 November 2021

———————————

*Military Judge:* Mark A. Bridges, U.S. Army (sentence rehearing).[1]

*Approved sentence:* Dishonorable discharge, confinement for life without eligibility for parole, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. Sentence adjudged 6 July 2018 by GCM convened at Robert Dole Federal Courthouse, Kansas City, Kansas.

*For Appellant:* Major Amanda E. Dermady, USAF; Mark C. Bruegger, Esquire; Brian L. Mizer, Esquire.

*For Appellee:* Lieutenant Colonel Amanda L.K. Linares, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Lieutenant Colonel Dayle P. Percle, USAF; Major Alex B. Coberly, USAF; Major Kelsey B. Shust, USAF; Major Zachary T. West, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, KEY, and RICHARDSON, *Appellate Military Judges.*

Senior Judge KEY delivered the opinion of the court, in which Chief Judge JOHNSON and Judge RICHARDSON joined.

———————————

---

[1] An Army military judge was detailed to this case due to the fact the Chief Trial Judge of the Air Force had been detailed as trial counsel at Appellant's initial court-martial.

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

---

KEY, Senior Judge:

## I. BACKGROUND

Seventeen years ago, in the early morning hours of 5 July 2004, Appellant murdered Senior Airman (SrA) AS and SrA AS's wife, Ms. JS, with a knife. Appellant attempted to murder another Airman, SrA JK, who survived despite suffering grievous wounds inflicted at Appellant's hands. Later that day, Appellant was apprehended by military law enforcement, and he subsequently confessed to the offenses. Appellant was charged with two specifications of premeditated murder and one specification of attempted premeditated murder, in violation of Articles 118 and 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 918, 880.[2] These specifications were referred as capital to a general court-martial, and just over a year after his attack, Appellant was found guilty of all three offenses and sentenced to death.

In August 2013—eight years after Appellant was sentenced—this court completed its Article 66, UCMJ, 10 U.S.C. § 866, review of Appellant's court-martial, affirming the findings of guilt but setting aside his sentence. *United States v. Witt*, 72 M.J. 727 (A.F. Ct. Crim. App. 2013) (en banc). Several of the judges assigned to the court did not participate in the opinion because they had joined the court after oral arguments had been heard but before the opinion was released. The court found Appellant's trial defense team deficient for not adequately investigating certain aspects of Appellant's case, including: the potential impact his motorcycle accident four months before the murders may have had on his mental processes; Appellant's mother's history of psychiatric issues and Appellant sharing, in part, the same diagnosis she had received; and the fact Appellant had expressed significant remorse for his conduct to a deputy sheriff tasked with guarding and escorting Appellant. Two judges dissenting in part agreed trial defense counsel were deficient but determined Appellant had not shown he was prejudiced. In setting aside Appellant's sentence, the court returned the case to The Judge Advocate General for remand to the convening authority with authorization for a rehearing on sentence. *Id.* at 775.

---

[2] Unless otherwise noted, all references in this opinion to the Uniform Code of Military Justice (UCMJ), the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.), which was the version in effect at the time of Appellant's rehearing. The relevant punitive articles in this edition of the *Manual* are substantially the same as those in effect at the time of Appellant's offenses.

Once this court's opinion was published, the Government petitioned the court to reconsider it, and the court agreed to do so. In June 2014, the court issued a new opinion mirroring the views of the two dissenting judges in the first opinion. *United States v. Witt*, 73 M.J. 738 (A.F. Ct. Crim. App. 2014) (en banc). Importantly, three of the judges who declined to participate in the first opinion did participate in the second opinion. The effect of this new opinion was to affirm Appellant's originally adjudged death sentence. Two years later, however, the United States Court of Appeals for the Armed Forces (CAAF) concluded the three judges who declined to participate in the first opinion were disqualified from later participation in Appellant's case, and the fact they participated in the second opinion constituted error. *United States v. Witt*, 75 M.J. 380 (C.A.A.F. 2016). The CAAF vacated the second opinion and returned the case for a sentence rehearing in accordance with this court's 2013 opinion. *Id.* at 385.

Despite Appellant's entreaties that his case be re-referred as non-capital, the convening authority signed a capital re-referral in January 2017. Appellant's sentencing rehearing was conducted over 35 days spread throughout the next year and a half, resulting in a 53-volume record of trial for the resentencing alone. On 6 July 2018, officer and enlisted members sentenced Appellant to confinement for life without eligibility for parole, along with a dishonorable discharge, forfeiture of all pay and allowances, reduction to the grade of E-1 and a reprimand. Appellant's case is now before us for the third time as we consider the 23 issues he raises with respect to his sentence rehearing, nine of which he raises personally pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).[3]

## II. DISCUSSION

### A. Issues Summarily Resolved

Appellant raises seven issues specific to capital punishment procedures under the Uniform Code of Military Justice (UCMJ).[4] We have carefully considered those issues and conclude that, because Appellant is no longer facing the

---

[3] The assignments of error (AOEs) raised through counsel, as well as the issues personally raised by Appellant pursuant to *Grostefon*, are listed in the Appendix to this decision.

[4] *See* Appendix, AOEs I through IV, and *Grostefon* Issues XV, XVII, and XXIII.

death penalty, none of these issues warrants relief and we do not address them in this opinion. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).[5]

Appellant also requests relief for cumulative error, but since we do not find a number of errors such that their combination would warrant relief, we do not analyze this allegation any further.[6]

Appellant has identified two minor errors in the court-martial order.[7] The Government concedes the errors and we direct corrective action in our decretal paragraph. Appellant invites us to reduce his sentence to life with eligibility for parole as a "stiff rebuke" of the Government's errors. After considering Appellant's arguments and the Government's response, we have determined that ordering a correction is the appropriate remedy.

## B. Member Selection

Appellant was sentenced by a 12-member panel consisting of officer and enlisted members. Prior to the sentencing rehearing, the parties agreed to a lengthy questionnaire which the military judge directed each prospective member to complete and return.[8] At the rehearing itself, the military judge conducted initial voir dire of the members as a group. The parties did not conduct any group voir dire; instead they conducted voir dire of each member individually.

Appellant raises five issues on appeal with respect to the selection of the members who served on his court-martial. Appellant personally raises the following four issues: (1) trial counsel committed prosecutorial misconduct by failing to timely disclose their use of a government expert as a panel-selection

---

[5] In the issue raised in *Grostefon* Issue XXIII, Appellant broadly claims the military judge erred in not giving "various defense-requested instructions" and points us to a motion and argument made at trial covering numerous proposed instructions. Nearly all of those instructions were specific to the death penalty, which we do not address in this opinion. We have carefully considered Appellant's claims regarding the other requested instructions (e.g., that the members be allowed to call each other by their first names; that the members must not make comparative judgments between the victims' families and Appellant's family; and that the military judge identify specific questions asked of certain witnesses to test their opinions) and we conclude they warrant neither discussion nor relief.

[6] *See* Appendix, AOE XIV.

[7] *See* Appendix, AOE XI.

[8] The instructions told the prospective members that they "must answer each question completely and accurately."

consultant;[9] (2) the military judge erred by failing to grant a defense request for additional peremptory challenges;[10] (3) the military judge improperly rehabilitated potential panel members during voir dire;[11] and (4) the military judge erred by allowing trial counsel to ask improper and untimely submitted questions during voir dire.[12] Through counsel, Appellant asserts the military judge erred by not granting the Defense's challenges for cause of three members who ultimately sat on his sentence rehearing: Senior Master Sergeant (SMSgt) AK, SMSgt ML, and Master Sergeant (MSgt) SC.[13] We resolve each of these issues adversely to Appellant.

### 1. Additional Background

#### *a. Panel-Selection Consultants*

One year before voir dire in the rehearing began, the Defense requested the convening authority appoint Mr. JG as their expert consultant in the field of jury consultation based upon the fact the Defense wished to use a death penalty-specific approach to voir dire known as the "Colorado Method." Just over a month later, the convening authority denied the request. The Defense then made a motion requesting the military judge compel Mr. JG's appointment, noting, *inter alia*, that the Government had arranged for the services of a "presentation expert" for trial counsel's benefit and that this expert was well versed in jury-selection psychology. During a hearing on the motion, trial counsel told the military judge the government expert would not be providing jury-consultation services and pointed to the fact the Defense already had a forensic psychologist on their team who could assist in selecting a panel. The Defense conceded their detailed psychologist was capable in providing such jury-selection assistance, and the military judge denied the Defense's motion on 17 September 2017, finding as a fact that the Government was not using a jury consultant. There is no further discussion of the matter in the trial transcript, with the exception that on 23 May 2018—the day voir dire began—trial defense counsel stated that Mr. JG was sitting at the defense table in the courtroom

---

[9] *See* Appendix, *Grostefon* Issue XX.

[10] *See* Appendix, *Grostefon* Issue XIX.

[11] *See* Appendix, *Grostefon* Issue XVIII.

[12] *See* Appendix, *Grostefon* Issue XXI.

[13] *See* Appendix, AOE V.

and that he was the Defense's jury consultant who had been appointed by the convening authority.[14]

At the conclusion of the rehearing, Appellant submitted matters in clemency identifying a number of alleged errors with respect to his court-martial, one of which was that the Government "abruptly reversed course" and granted the Defense's request for Mr. JG "[m]ere weeks before the beginning of voir dire." According to Appellant, the Government communicated this reversal at the same time it notified the Defense that the Government's presentation expert would, in fact, be assisting with the Government's voir dire. Appellant asserts he was denied the ability to make full use of Mr. JG's expertise while trial counsel "surreptitiously expand[ed]" the scope of their own expert's services. Appellant asserts trial counsel committed prosecutorial misconduct by doing so, and he proposes we reduce his sentence to life with the possibility of parole as a remedy.

### b. Peremptory Challenges

Prior to Appellant's sentencing rehearing, trial defense counsel moved the military judge to grant the Defense additional peremptory challenges. They advanced several bases for this request, such as: that the Government effectively had unlimited peremptory challenges in light of the convening authority's ability to hand-pick all the potential members from the outset; that because a panel in a capital court-martial required at least 12 members while a non-capital court-martial required only 5, Appellant should be afforded a proportional increase in the number of peremptory challenges; and that because other jurisdictions provided for a significantly larger number of peremptory challenges, so should Appellant's court-martial. The Government opposed Appellant's motion and the military judge denied the request without setting out any particular rationale.[15] In his ruling, however, the military judge advised the Defense they could request additional peremptory challenges during the voir dire process, "should the need arise," but trial defense counsel never made a subsequent request.

The court-martial was initially assembled for the rehearing on Appellant's sentence with 18 members. Immediately before voir dire began, the members took an oath which included each member swearing or affirming that they

---

[14] According to documents attached to the record of trial, the convening authority's legal office recommended on 5 April 2018 that the defense expert be appointed because "the Government has requested a jury consultant expert as well. . . ." This request was granted on 12 April 2018. The documents do not indicate what prompted the Government's change in position.

[15] The Defense also moved the military judge to prohibit the Government from exercising its peremptory challenge, but the military judge denied that motion as well.

would "answer truthfully the questions concerning whether [they] should serve as a member of this court-martial." Eventually, 10 of the 18 members were excused for cause, but as discussed in greater detail below, the military judge denied defense challenges of SMSgt AK and MSgt SC.

Eight additional members were detailed to the court-martial and sworn, and three of these eight were excused based upon defense challenges. The military judge denied a defense challenge to one member—SMSgt ML. With 13 members remaining, trial counsel elected not to exercise the Government's peremptory challenge, while the Defense used its peremptory challenge to excuse one of the newly detailed members, leaving a panel of 12. The military judge commented, "So I think we have our panel. Any concerns with that?" Trial defense counsel answered, "Only those previously made in the prior motion. We don't believe it's an issue at this point." Which motion trial defense counsel was referring to is unclear.

### c. Military Judge's Questions

Prior to the sentence rehearing, the Defense made a motion to prevent the military judge from "rehabilitating" members during voir dire. The basis for the Defense's motion was rooted in the claim that members would be less candid when questioned by a judge, and would be more likely to give the judge the answers they believed the judge would want to hear rather than their honest opinions. The Government opposed the motion, and the military judge denied it, explaining he would not attempt to "rehabilitate" members and that any questions he asked would be in an "attempt to clarify a member's answer or position on an issue."

Midway through the voir dire of the initial 18 members, trial defense counsel objected to the military judge "rehabilitating" two members when he essentially asked them if they would follow the law. The first of these two members told trial defense counsel that while she understood the Defense did not have to present any evidence, if they wanted her to vote for a less severe punishment, the Defense would need to "help [her] understand." The military judge later asked that member to clarify whether or not she would automatically vote for the death penalty if the Defense put on no evidence. The member explained it was the Defense's right not to offer any evidence, and that she would still consider any mitigating or extenuating evidence, regardless of its source. The military judge asked the second member about his response to an item on his questionnaire, in which the member indicated the death penalty was the only appropriate punishment for killing more than one person. The member replied, "I believe so, yes. I think I also gave a verbal description afterwards as if—

maybe as more middle-of-the-road answer instead of checking both boxes."[16] The military judge said, "I just want to make sure that—what your answer is to this and that is, do you believe that the death penalty is the only appropriate punishment for somebody who kills more than one person?" The member answered, "No." The military judge also asked the member if he would be willing to consider all the evidence and apply the law before deciding whether death was an appropriate punishment; the member said he would.

Trial defense counsel argued that the military judge was conducting "improper rehabilitation" by effectively asking the members if they would follow the law. The military judge said he disagreed with that view, and voir dire resumed. The two members trial defense counsel asserted had been improperly rehabilitated were ultimately excused for cause.

The root of the Defense's objection lay in trial defense counsel's overall voir dire strategy, which was to uncover the members' perspectives—primarily with respect to the death penalty—untainted by any explanation or guidance given by the military judge. As trial defense counsel explained to the military judge at one point, "We need to have the ability to go into their substantial beliefs, their core beliefs, what they value, what they don't value." This led to a series of defense voir dire questions posed in hypothetical terms, some of which called upon the members to "pretend we're just in a coffee shop, just chatting" and to disclose their "personal feelings on things." In light of this strategy, the Defense lodged periodic objections when the military judge or trial counsel would ask the members whether they would follow the law or not, under the theory that doing so interfered with the Defense being able to determine what the members "really" believed. As trial defense counsel explained to the military judge,

---

[16] This item on the questionnaire, Question 105, contained four subparts calling for the person filling out the questionnaire to check either "yes" or "no" for each. Question 105 then asked "please explain," followed by five blank lines. The entire question reads as follows:

> Do you personally believe that death (and not confinement for life either with or without the possibility of parole) is the only appropriate punishment for a person who: [1] Intentionally kills another human being? [2] Intentionally kills more than one other person? [3] Intentionally kills another person with a knife? [4] Does all of the above? Please explain.

The member marked "yes" for the second and fourth subparts and wrote the following in the "explain" area: "With out [sic] details as to what may or may not have led to one killing another intentionally, it would be hard to give it a blanket yes. However if you intentionally killed several individuals with a knife it would be more of a yes than a no."

> We're in this avenue in which they've been told by the [c]ourt, they've been told by [trial counsel] and in this case told by the [c]ourt again, "You must consider everything." So when we ask them, can you consider something, the answer is automatically a rote response of, "I can consider that."
>
> . . . .
>
> . . . Before the members are even allowed to tell us their core beliefs the [c]ourt is telling them this is the law.

Trial defense counsel explained they were not contesting the authority of the court to ask such questions, but rather the timing of the questions: "So when it's occurring in the middle of the voir dire by the [D]efense it hampers our abilities to get to their personal opinions . . . because they're parroting back the [c]ourt's words, I can consider, I can consider, I can consider."

Regarding the objections the Defense made to questions posed by the military judge under the above theory, all but one of these members were subsequently excused and did not sit on Appellant's court-martial. The one member who did ultimately participate in Appellant's rehearing was SMSgt AK, whom trial defense counsel asked how he felt when someone "use[s] their background as a—as a way to maybe get away with something or reduce their culpability." SMSgt AK answered, "It's hard to describe how I feel about something I've not really experienced so um, I just think it's distasteful." When asked why he thought that, SMSgt AK said, "Dishonest." Trial defense counsel then sought to ask SMSgt AK whether or not "genetics, upbringing, circumstances of birth" would need to relate to the crime before SMSgt AK would consider them in determining an appropriate punishment, but trial counsel objected. Without ruling on the objection, the military judge engaged in the following colloquy with SMSgt AK:

> MJ [Military Judge]: Well, let me—let me tell you this Senior Master Sergeant, that is—as you've been told you are expected as a member to consider all of the evidence right? And then once you've considered it all determine what it means to you, how much weight you're going to give it, right?
>
> MBR [SMSgt AK]: Yes, sir.
>
> MJ: So you are expected to consider any evidence that's presented to you. Do you understand that?
>
> MBR: Yes, sir.
>
> MJ: Do you have the ability to do that?

[Trial defense counsel]: Sir—Your Honor, I'm sorry. I just want to put on the record that we object to this per our previous motion.

MJ: Do you have any problem in doing that?

MBR: No, sir.

MJ: Okay. So you can consider any evidence that's presented to you?

MBR: Yes, sir.

MJ: All right. So I think that counsel's question then is going to go to whether or not you can consider specific pieces of evidence, okay?

MBR: Yes, sir.

MJ: All right. You may continue.

Trial defense counsel then told SMSgt AK,

I just want to make sure that I'm being clear with what I'm going at because a lot of the questions are: Can you follow the law? Can you follow the law? And I want to start a step back from that of just, what are your feelings? What do you think? How do you believe? And then, you know, depending on your answer we can certainly go back, you know, the judge—like the judge just did.

Trial defense counsel asked SMSgt AK about whether "genetics or upbringing, or environmental background" would have to relate to the crime before he would consider it, and SMSgt AK said "no," and that he would consider any such information, although he was not sure how much weight he would give it.

On appeal, Appellant adopts the arguments he made at trial regarding the military judge "asking the members rehabilitative questions." Appellant highlights SMSgt AK's presence on the panel as evidence of the prejudice he suffered by virtue of these questions being asked.

### d. Trial Counsel's Questions

During the interim between the voir dire of the first 18 members and the later detailing of new members, the Defense submitted a motion asking the military judge to preclude trial counsel from asking "pre-scripted questions not included in their initial anticipated voir dire submissions."

Similar to their objections to the military judge's questions, trial defense counsel argued the Government's questions merely exhorted the members to "follow the law" and, further, that the questions were not provided in advance

of voir dire as required by the military judge's scheduling order. This latter claim was premised on the fact that trial counsel had been asking the members questions not appearing in the Government's proposed voir dire questions which had been submitted in advance of the rehearing. These new questions largely asked the members to commit to considering all the evidence they were presented with—whether in aggravation, extenuation, or mitigation—in deciding on an appropriate punishment and to not prematurely decide on a sentence before all the evidence was presented.[17]

Trial defense counsel wrote in their motion that the Defense needed to ascertain whether the members were "truly capable of giving meaningful consideration and effect to mitigation evidence," but trial counsel's approach to voir dire "tells [the prospective members] the law and then demands that they follow the law." Thus, the Defense argued, the prospective members were merely agreeing to consider evidence because they were being told to do so, not because they were actually capable of considering or willing to consider all the evidence.

Trial counsel responded to the motion orally, arguing they were only asking the members whether they would consider the range of sentencing options available to them, whether they would consider all the evidence, and whether they would follow the military judge's instructions to do those things. To this, trial defense counsel reiterated their chief complaint that they were "not able to determine [the members'] core beliefs and whether they are capable of following the court's instructions" because trial counsel's questions had the effect of telling the members what the law required of them. The military judge denied the Defense's motion, saying he did not find "anything improper about the questions that the [G]overnment was asking." Neither the military judge nor trial counsel made reference to the Defense's claim that trial counsel had failed to follow the scheduling order.

### e. Challenge of SMSgt AK

The Defense challenged SMSgt AK on three grounds: (1) that he was biased in favor of law enforcement; (2) that he would not consider all mitigation evidence;[18] and (3) that he would require the Defense to establish a nexus between mitigation evidence and the crime.[19] The Defense argued SMSgt AK had

---

[17] The military judge earlier told the parties he wanted the proposed voir dire submissions to include questions the parties intended to ask the members either individually or in a group setting. He added that he would allow the parties to "follow up on certain questions if necessary."

[18] At trial, the Defense referred to this ground as "mitigation impairment."

[19] The Defense called this "mitigation nexus."

demonstrated both an actual and implied bias with respect to the first ground and an implied bias with respect to the other two.

During voir dire, trial counsel asked SMSgt AK about the fact he had indicated on his pretrial questionnaire that he was more likely to believe a witness who worked in law enforcement. In the questionnaire, SMSgt AK answered, "Yes, in general, I believe law enforcement professionals are held to a higher standard and are considered honest and trustworthy." Trial counsel then asked SMSgt AK whether he would agree to not give law enforcement officers who testified any more or less credibility "off the bat" than other witnesses. SMSgt AK said he would so agree, and in response to questions from trial counsel, he further agreed he would consider any evidence provided by law enforcement witnesses along with all the other evidence in the case and "make a judgment as to whether [that is] supported or contracted by all the other evidence that may be presented in the case." Trial defense counsel also asked about the matter, and SMSgt AK said, in part, "Though I do believe that law enforcement does have some credibility over somebody that doesn't have that kind of background but I would still have to listen to all of the information before I could apply any kind of weight." Later, the military judge asked SMSgt AK, "Do you think the fact that you assign some credibility to law enforcement officers is going to prevent you from weighing a law enforcement officer's testimony the same as you would any other witness's testimony?" SMSgt AK responded, "No, sir," and told the military judge he would use the same standards for weighing a law enforcement officer's testimony as he would any other witness. The military judge then asked if there was any doubt in his mind about that, and SMSgt AK answered, "No, sir."

With respect to mitigation evidence, Question 106 on the questionnaire asked,

> Aside from the crime, do you believe that the background and life circumstances of a person guilty of killing another should play a part in the decision as to their punishment?

SMSgt AK circled "no" and wrote, "We are all a product of our background, however we all understand right from wrong, with very few exceptions." Trial counsel pointed to this questionnaire response and asked SMSgt AK whether or not—if he was given evidence of the background and life circumstances of a person convicted of murder—he would consider that evidence. Trial counsel also asked him if he would "seriously think about the evidence before [he would] assign it any weight or value." SMSgt AK answered both questions in the affirmative. Trial counsel further asked SMSgt AK if he had any doubt whether he would be able to "seriously think about" evidence of "the accused's background, how he grew up, . . . what he was like as a kid, what his family was like." SMSgt AK responded, "I have no doubts." Trial defense counsel also

12

asked SMSgt AK to elaborate on his answer to Question 106, and SMSgt AK explained, "I think just as you're brought up you are developed as a person based on your upbringing. And I understand that. Um, your parents affect you, your school, your community makes you the person that you are."

Question 107 on the questionnaire asked members,

> Some people feel the genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment of someone convicted of a crime. What are your thoughts?

In response to this question, SMSgt AK wrote that he did not agree with this proposition, "unless there is a proven mental health condition associated with the issue." Trial counsel asked SMSgt AK if he would be able to consider such evidence before deciding an appropriate sentence and whether he would "agree to hear it and seriously think about it" before assigning the evidence any weight or value. To both questions, SMSgt AK said he would. Trial defense counsel asked whether "genetics, upbringing, or circumstances of birth" would have to relate to the crime before SMSgt AK would consider it, at which point trial counsel objected and the colloquy quoted in Section II(B)(1)(c), *supra*, between the military judge and SMSgt AK followed. As explained above, SMSgt AK told trial defense counsel he would consider evidence about Appellant's background and upbringing "whether it was applicable to the case or not," but that he was not sure how much weight he would give it. He added, "If it's applicable to the individual it does tie to the case. I can see that."

Trial defense counsel also asked SMSgt AK about Question 108 on the questionnaire:

> In a sentencing-only case, what kind of information do you think would be important for you in determining an appropriate sentence?

SMSgt AK wrote, "The facts as to what happened, how it played out. Are there any proven mental health issues." Trial defense counsel asked SMSgt AK what he meant, and SMSgt AK said, "Anything that would prove that the individual had some sort of mental health issue that would have contributed towards the commission of the crime." Trial defense counsel then asked if it would be "on us" to prove mental health evidence, to which SMSgt AK said, "No, ma'am. . . . It's not on your side to actually prove anything." Trial counsel objected to a follow-on defense question as confusing at which point SMSgt AK volunteered, "If it makes it any easier for you, ma'am, if it's presented it will be considered." Shortly thereafter, he added, "I know that there are mental health issues that do affect people and their decision making."

Trial defense counsel never asked SMSgt AK whether he would automatically reject evidence related to Appellant's mental health which was unconnected to the crime, and SMSgt AK never said he would.

In lodging a challenge against SMSgt AK, trial defense counsel argued SMSgt AK had said he would give greater credibility to those in law enforcement, although trial defense counsel somewhat selectively quoted SMSgt AK's answers. For example, trial defense counsel asserted SMSgt AK had said, "I do believe that law enforcement has credibility over someone who doesn't have that . . . background," but omitted the rest of his answer in which he said, "but I would still have to listen to all of the information before I could apply any kind of weight." Trial defense counsel's primary contention was that SMSgt AK had maintained he would give law enforcement witnesses' credibility more weight up until the point where the military judge "asked him whether he could follow the law."

Trial defense counsel also argued SMSgt AK had "an impairment as to mitigation and particularly an impairment as to any mitigation if it's not directly tied to the offense." As an example, trial defense counsel asserted SMSgt AK said he would consider mental health issues, but only if they had "something to do with the crime." In seeking to clarify the Defense's challenge, the military judge asked, "am I hearing you right, that the mitigation impairment and the mitigation nexus all involved mental health evidence?" Trial defense counsel answered, "Well, Your Honor, that's the most clear instance in which he responded. . . . But specifically with mental health, those are the two—the only version of mitigation that he offered but it has to be mental health that is associated with the crime." In support of this contention, trial defense counsel pointed to SMSgt AK's discussion of Question 108, to which the military judge noted it was SMSgt AK who first suggested he would consider mental health-related evidence. Trial defense counsel argued SMSgt AK was "not acknowledging that he can consider mitigation that's not connected to the crime, mental health that's not connect [sic] to the crime." At this point in their challenge, trial defense counsel shifted to a broader attack on the voir dire process, asserting they were "significantly impaired by the 30 minutes of voir dire from the [G]overnment saying, 'this is the law, this is the law, this is the law' and this [c]ourt itself saying, 'this is the law, this is the law.'" Trial defense counsel claimed these interjections interfered with the Defense's "ability to go into [the members'] substantial beliefs, their core beliefs, what they value, what they don't value."

After some discussion about the military judge's ability to ask the members whether they will follow his instructions, the military judge denied Appellant's challenge of SMSgt AK. He noted that being more likely to believe a person who works in law enforcement might not be "universally held," but was "not

an unusual view," and that SMSgt AK had said he would weigh the testimony of law enforcement witnesses "along with all the other evidence in the case and using the same standards as any other witness." The military judge found no indication SMSgt AK held "law enforcement officers in such high esteem that he's going to be unable to follow [his] instructions to use the same standards in weighing and evaluating the testimony." The military judge further determined SMSgt AK "clearly indicated that he would consider mental health issues" and told the Defense, "there is no evidence here or no indication, as you've phrased it, mitigation impairment and mitigation nexus problems with respect to mental health evidence in this case." As a result, he found no actual bias on SMSgt AK's part with respect to either law enforcement or his ability to consider mitigation evidence. The military judge also explained he found no implied bias because he did not believe "that the average member of the public, somebody watching this trial would think that [SMSgt AK] was not able to perform his duties or that [Appellant] was not getting a fair trial," and that he was denying the challenge after considering the liberal grant mandate.

### *f. Challenge of MSgt SC*

The Defense also challenged MSgt SC, advancing three main theories: (1) that she would automatically vote to impose the death penalty; (2) that she would shift the burden of proof to the Defense; and (3) that she had a poor ability to follow directions.

In her questionnaire, MSgt SC indicated that she supported the death penalty, that she believed it should be an option in the case of "heinous" crimes, and that factors such as whether an accused showed remorse or evidence of rehabilitative potential should be considered in deciding whether to impose such a sentence. Question 92 provided respondents the opportunity to pick from seven different answers to this question:

> Which of the following statements accurately represent the way you feel about the death penalty? (Select as many or as few of the following choices as you wish.)

Of the seven options, MSgt SC chose these three:

> (1) In a case in which the accused is convicted of murder and in which the death penalty is requested, I will always vote to impose the death penalty, regardless of the facts and the law in the case.

> (2) I am generally in favor of the death penalty, but I would base a decision to impose it on the facts and the law in the case.

(3) I am generally opposed to the death penalty, but I believe I can put aside my feelings against the death penalty and impose it if it is called for by the facts and the law in the case.

When asked by the trial counsel about her selection of the first choice during voir dire, MSgt SC answered,

Um, I was thinking that I would be weighing all of the evidence and depending on the circumstances of the evidence then it would either be a dead set we're going to go death penalty . . . or I think there's a different avenue we can take. And so it was— it's really just—there will be a consequence or rehabilitation possibility or it could be the death penalty.

MSgt SC also said that just by hearing the nature of the charges in Appellant's case, without having heard any evidence, she "would probably be leaning more towards the death penalty. . . . I wouldn't say it's necessarily automatic." Trial counsel reminded MSgt SC that the military judge had told her she would need to consider all the sentencing options, and then asked her if she thought "the death penalty is just kind of automatic." MSgt SC answered, "Yes, in this case, the way you just asked it, it would probably be an automatic for the death penalty because I don't know anything else. . . . And it's premeditated." Trial counsel then asked MSgt SC a series of questions related to evidence offered in extenuation and mitigation before asking MSgt SC whether she could "seriously think about and give meaningful consideration to a sentence of even life with the possibility of parole for somebody who's committed two counts of premeditated murder," to which MSgt SC responded, "Absolutely." Trial counsel asked why she was so confident she could do so, and MSgt SC said, "Because you just said that we—once I get all the evidence then I'm going to do the weight factor on this . . . so therefore, all options are still available . . . until I get everything." She also told trial counsel she would consider all sentencing options, that she could not make a decision yet because she had not heard the evidence, and that she would keep an open mind.

Trial defense counsel followed up on MSgt SC's statement about voting for the death penalty based on the charges alone, and MSgt SC explained,

Yes, and that's—that's still the same. If I have to give a choice and there's like no evidence and that's all I got is he's been found guilty for these then yes, I would be leaning towards the death penalty. But I mean, if—I mean, that's just the way I see it. [ ] But if I have the option now to ask questions [ ] and get [ ] more information [ ] then that's going to persuade.

16

MSgt SC went on to explain that while the death penalty would be "seriously considered but until you get all of the evidence I can't make that determination." Trial defense counsel asked whether there were any crimes in MSgt SC's mind which automatically warranted the death penalty, and MSgt SC answered that premeditated murder is "pretty heavy," but "there's still a lot of unanswered questions and so if we're going to go on I'm making sure that we've got all of the evidence." MSgt SC later said she would consider such factors as whether a person could be rehabilitated, whether a person is suffering from mental illness, and whether a person has shown remorse in deciding whether or not the death penalty was warranted. She also agreed that the death penalty would not be appropriate if the Government could not establish evidence in aggravation substantially outweighing mitigation evidence, that she would give meaningful consideration to all the evidence before deciding on a punishment, and that the Government had the entire burden in the case.

One of the questionnaire's questions asked MSgt SC what she understood the phrase "burden of proof" to mean. MSgt SC wrote, "I believe this to be where each party within the trial produced the evidence that will prove the claims they have made against the other party." When trial defense counsel asked her to elaborate, MSgt SC first noted that she was unfamiliar with the legal terminology and then explained that when she was completing the questionnaire, she was unaware the issue of Appellant's guilt had already been decided. Later, in response to trial counsel's questions, MSgt SC said that once she knew the case would be solely about sentencing, she understood "the evidence will just come from one side," that is, the Government. Trial counsel responded by telling her, "Your duty is to consider all the evidence that's presented in this case, no matter who it's presented by," and MSgt SC then said, "Okay. Then if that's the case then yes, I would take [evidence offered by either party] under consideration." Trial counsel emphasized this point again by specifically asking MSgt SC if she would consider whatever evidence the Defense offered, and she said she would. The military judge asked her if she understood the Defense did not have to actually present any evidence; that if the Defense did present evidence, she was bound to consider it; that the Government had the burden; and that she was required to consider all evidence, regardless of which party offered it. She said she understood each of those propositions.

In challenging MSgt SC, the Defense argued she had "an implied bias for the automatic death penalty" and that "she has a burden shift toward the [D]efense." The Defense essentially claimed MSgt SC's starting position was that the death penalty was warranted, and that she would require the Defense to prove a lesser sentence was appropriate by introducing evidence of such mitigating factors as remorse or rehabilitative potential. The Defense also said they had "a concern with her ability to follow directions" because MSgt SC left three questions on her questionnaire blank and answered others with only a

"yes" or a "no," in spite of the military judge's instructions to fully answer every question. Finally, the Defense pointed to her demeanor during voir dire, saying that she was "repeatedly laughing and things like that."[20]

The military judge denied the Defense's challenge, explaining that MSgt SC did not exhibit actual bias because she said she would consider all punishment options and that she would consider all the evidence in deciding what punishment was appropriate. The military judge further said that, considering the totality of her answers, there was "nothing that indicated that she believes the death penalty is an automatic in any case, in fact, quite the opposite. She said she'll consider all the evidence." The military judge concluded the Defense had not established either actual or implied bias on MSgt SC's part and that he would not excuse her, even after considering the liberal grant mandate. The military judge did not comment on the Defense's concern about MSgt SC being able to follow directions.

### g. Challenge of SMSgt ML

The third member the Defense unsuccessfully challenged was SMSgt ML, whom the Defense argued was unwilling to consider evidence in mitigation that might not be directly tied to the crime at hand. This argument was rooted in both SMSgt ML's answers on her pretrial questionnaire as well as statements she made during voir dire.

SMSgt ML maintained that the death penalty was never an automatic sentence, but one item on the questionnaire asked whether "the background and life circumstances of a person guilty of killing another should play a part in the decision as to his punishment," and SMSgt ML answered, "I think that only information pertaining to this case should determine the outcome." The next question read:

> Some people feel that genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment of someone convicted of a crime. What are your thoughts?

SMSgt ML answered, "I disagree with this statement. The environment that I grew up in may have been consider[ed] one where teenage girls get pregnant and may not become productive citizens. However I think we choose our own paths and determine what we want our story to be." During voir dire, SMSgt ML said she could consider evidence regarding Appellant's upbringing and environment, and that she would "seriously listen to it" and consider it before deciding on a punishment. She further agreed to hear all the evidence before

---

[20] Other than this comment by trial defense counsel, there is no indication in the record that MSgt SC was laughing at all, much less when or why.

coming to any conclusions regarding an appropriate punishment and to keep an open mind.

When asked about the question on the questionnaire as to whether she thought the background and life circumstances of a person found guilty of murder should play a part in deciding that person's sentence, SMSgt ML referred to a prior court-martial she had been a member on. SMSgt ML said that family members had testified in the court-martial to matters which she felt "really didn't have to do with the case." She said that, as a result, she understood she "had to weigh [that testimony] based on the importance with the other evidence." She said she recognized she may hear evidence about Appellant's background and added, "But if it's not part of the actual circumstances around the case, then I need to figure out how to weigh that information." Trial defense counsel asked SMSgt ML if there was any evidence she would never give weight to, and she answered, "None of it would never have a weight because if it's presented to us, then obviously I have to consider it." Nevertheless, SMSgt ML answered a series of questions in which she told trial defense counsel that one's background does not "affect what you do later in life;" that if someone grew up in poverty on drugs, that would not mean anything regarding their punishment; and that if a person used alcohol or drugs at some point in their life, that would not mean anything to her.

Trial counsel asked SMSgt ML if she would consider evidence about Appellant's background if the military judge told her to do so, and she said she was "pretty confident" that she could seriously consider it. She explained,

> I just feel that I know I can listen to the information, whatever's presented here. And then I would take it back there and consider it. I'm not saying that I'm going [to] say no, his background is not important at that time, if it plays a part in the information that's presented to us. [ ] I think I could consider it.

Upon additional questioning by the military judge, SMSgt ML confirmed she would consider any mitigating evidence even if it had nothing to do with Appellant's crimes.

The Defense challenged SMSgt ML on an implied bias ground described by trial defense counsel as, "she would require [a] nexus between mitigation evidence and the crime." Trial counsel countered that SMSgt ML was only required to consider evidence, not necessarily give it any weight. The military judge denied the challenge, reasoning that there is a difference between having a "general view" that a person's upbringing does not have a large role in their life and being unwilling to consider such evidence when making a decision. The military judge noted SMSgt ML said she understood she must consider all the evidence in the case and that she would do so, leading him to conclude SMgt

ML should not be excused under either actual or implied bias grounds, even in light of the liberal grant mandate.

### 2. Law

#### a. Prosecutorial Misconduct

We review claims of prosecutorial misconduct de novo; when no objection is made at trial, the error is forfeited, and we review for plain error. *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citation omitted). Under the plain error standard, such error occurs "when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted).

"Trial prosecutorial misconduct is behavior by the prosecuting attorney that 'overstep[ped] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *Id.* at 178 (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, e.g., a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger*, 295 U.S. at 88) (additional citation omitted).

#### b. Voir Dire

Military judges have discretion in controlling the nature and scope of voir dire. Rule for Courts-Martial (R.C.M.) 912(d), Discussion. "Generally, the procedures for voir dire are within the discretion of the trial judge." *United States v. Jefferson*, 44 M.J. 312, 318 (C.A.A.F. 1996). A military judge may permit counsel for the parties to conduct voir dire, or the military judge may conduct the examination him- or herself. R.C.M. 912(d). Military judges may also supplement questions asked by counsel. *Jefferson*, 44 M.J. at 318–19. Limitations placed by a military judge on the voir dire process are reviewed for abuse of discretion. *United States v. Richardson*, 61 M.J. 113, 118 (C.A.A.F. 2005). Military judges' decisions amount to abuses of discretion if their findings of fact are clearly erroneous, their decisions were influenced by an erroneous view of the law, or their decisions are "outside the range of choices reasonably arising from the applicable facts and the law." *Finch*, 79 M.J. 389, 394 (C.A.A.F. 2020) (quoting *United States v. Frost*, 79 M.J. 104, 109 (C.A.A.F. 2019)).

#### c. Member Challenges

An accused has the right to an impartial and unbiased panel. *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012) (citation omitted). A person detailed to a court-martial shall be excused whenever it appears he or she "[s]hould not

sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." R.C.M. 912(f)(1)(N). Such is the case when a person "has a decidedly friendly or hostile attitude toward a party; or has an inelastic opinion concerning an appropriate sentence for the offenses charged." R.C.M. 912(f)(1)(N), Discussion. Potential court-martial members are subject to challenges for cause under actual bias and implied bias theories. *United States v. Hennis*, 79 M.J. 370, 384 (C.A.A.F. 2020). Under the former, the question is whether the member personally holds a bias "which will not yield to the military judge's instructions and the evidence presented at trial." *Nash*, 71 M.J. at 88 (citation omitted). Claims that a military judge erred with respect to challenges alleging actual bias are reviewed for an abuse of discretion. *Hennis*, 79 M.J. at 384.

Our superior court has framed the analysis of implied bias as: considering the totality of the circumstances and assuming the public is familiar with the military justice system, "whether the risk that the public will perceive that the accused received something less than a court of fair, impartial members is too high." *United States v. Woods*, 74 M.J. 238, 243–44 (C.A.A.F. 2015) (internal quotation marks and citation omitted). Our review of implied bias challenges is more deferential than de novo review, but less deferential than abuse of discretion. *Hennis*, 79 M.J. at 385. Implied bias, however, "should be invoked sparingly." *United States v. Moreno*, 63 M.J. 129, 134 (C.A.A.F. 2006) (citation omitted).

When an accused challenges members for cause, the military judge is required to liberally grant such challenges. *United States v. James*, 61 M.J. 132, 139 (C.A.A.F. 2005). Reasons for this include the fact that peremptory challenges in the military justice system are far more constrained than in the civilian criminal justice arena, as well as convening authorities' broad discretion to detail members to courts-martial. *Id.* (citations omitted). "Challenges based on implied bias and the liberal grant mandate address historic concerns about the real and perceived potential for command influence on members' deliberations." *United States v. Clay*, 64 M.J. 274, 276–77 (C.A.A.F. 2007). Military judges who squarely address the liberal grant mandate on the record are given greater deference on appeal than those who do not. *Id.* at 277.

An inelastic opinion regarding the appropriate punishment is grounds for an actual-bias challenge, while "a mere predisposition to adjudge some punishment upon conviction is not, standing alone, sufficient to disqualify a member. Rather the test is whether the member's attitude is of such a nature that he will not yield to the evidence presented and the judge's instructions." *Hennis*, 79 M.J. at 385 (quoting *United States v. McGowan*, 7 M.J. 205, 206 (C.M.A. 1979)) (additional citation omitted). When a potential member in a death-penalty case has expressed views on capital punishment, the standard for a causal

challenge of that member "is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Morgan v. Illinois*, 504 U.S. 719, 728 (1992) (internal quotation marks and citation omitted). Thus, a member "who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Id*. at 729.

The burden in establishing the grounds for the challenge of a member lies with the party making the challenge. R.C.M. 912(f)(3). When a basis for challenge is first raised on appeal, we review such claims for plain error. *United States v. Ai*, 49 M.J. 1, 5 (C.A.A.F. 1998) (citation omitted).

### 3. Analysis

#### a. Prosecutorial Misconduct

Although Appellant objected to the convening authority's initial decision not to appoint Mr. JG as a defense consultant and sought relief from the military judge from that decision, the Defense did not raise any concerns regarding Mr. JG's subsequent detailing until after the court-martial adjourned. Appellant's chief post-trial complaint is that he was denied the ability to utilize Mr. JG's expertise as much as he would have, had Mr. JG been appointed earlier. This may very well be true, but it was not raised to the military judge who would have had the ability to grant Appellant more tailored and relevant relief at the time as compared to the relief he seeks from us now: a reduction of his sentence. More saliently, had Appellant objected prior to or during the rehearing, we would have a more developed record on the matter indicating how the decision to detail Mr. JG came about and what role, if any, trial counsel played in the decision. The record is practically devoid of this information, and it is Appellant's inability to explain precisely what trial counsel did or did not do that is fatal to his claim of prosecutorial misconduct.

From the record, we know the convening authority initially denied the Defense's request for Mr. JG's services, and the military judge declined to overrule that decision because the Defense had another expert who could provide similar services, and because trial counsel asserted they had no jury consultant assigned to their team. About a month and a half before trial was set to begin, the convening authority's legal office reversed its recommendation and the convening authority reversed his earlier decision, resulting in the appointment of Mr. JG to the defense team. Almost immediately afterward, trial counsel notified the Defense that the Government's presentation expert would in fact be providing voir dire consulting services, after all. While it appears the convening authority appointed Mr. JG as a defense consultant because trial counsel made a decision to request their own panel-selection expert, Appellant has not

demonstrated trial counsel did so in order to gain some improper tactical advantage. Indeed, it seems just as plausible that trial counsel belatedly realized they needed assistance in selecting a panel and recommended the convening authority grant the same assistance out of their concern that Appellant receive a fair rehearing. Moreover, nothing in the record explains whether or how trial counsel was able to capitalize on this reversal or its timing.

Appellant has not specified any particular legal norm or standard trial counsel purportedly violated, and we cannot identify one from the record before us. Thus, Appellant has not established error with respect to Mr. JG's detailing, much less plain error. While we agree the convening authority's late reversal, and trial counsel's expansion of their expert's role after telling the military judge they would not use their expert in such an expanded capacity, might appear suspicious, such suspicion is insufficient to support a finding of prosecutorial misconduct. Appellant, therefore, is entitled to no relief.

### b. Peremptory Challenges

Although a common feature of criminal trials, peremptory challenges are not guaranteed by the United States Constitution. *United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000). In courts-martial, an accused and the Government are "entitled initially to one peremptory challenge of the members of the court" under Article 41(b)(1), UCMJ, 10 U.S.C. § 841(b)(1). If challenges for cause reduce the court below the required minimum number of members, as occurred here, peremptory challenges are not exercised until additional members are detailed to the court. Article 41(a)(2), UCMJ, 10 U.S.C. § 841(a)(2). If, however, a peremptory challenge results in the court having insufficient members, then the parties may exercise another peremptory challenge against later-detailed members. Articles 41(b)(2) and 41(c), UCMJ, 10 U.S.C. §§ 841(b)(2), 841(c). Notwithstanding this statutory scheme, a military judge has discretion to grant additional peremptory challenges, and indeed has a duty to do so when necessary to ensure a fair trial. *United States v. Carter*, 25 M.J. 471, 476 (C.M.A. 1988). The denial of additional challenges is reviewed for abuse of discretion. *Id.*

At trial, Appellant relied on *Carter* in support of his argument for additional peremptory challenges. In that case, the United States Court of Military Appeals concluded military judges must grant additional peremptory challenges after the original exercise of peremptory challenges results in new members being detailed to the court-martial; the holding in *Carter* led to the amendment of Article 41, UCMJ, to explicitly authorize additional peremptory challenges in such cases. *See, e.g.*, *United States v. Thomas*, 43 M.J. 550, 593 (N.M. Ct. Crim. App. 1995), *rev'd on other grounds*, 46 M.J. 311 (C.A.A.F. 1997). This *ability* of the military judge in Appellant's case to grant additional peremptory challenges is a far cry from a *requirement* to do so. Here, when denying the

Defense's pre-trial motion, the military judge gave the Defense the opportunity to seek additional peremptory challenges during the voir dire process, but the Defense declined to do so. Even assuming Appellant has preserved this issue for appeal, he has failed to demonstrate that he was entitled to additional challenges, that the military judge's denial of additional challenges operated to deprive him of a fair trial, or that the military judge abused his discretion in this regard. His claim therefore warrants no relief.

### c. Military Judge's Questions

As explained above, trial defense counsel sought to determine the members' personal views on various matters, and the counsel felt the members would be less likely to give complete or forthright answers after being told what was required under the law by the military judge. We recognize voir dire is a valuable tool in both determining whether or not potential members will be impartial, as well as assisting the parties in deciding how or whether to exercise peremptory challenges. *See, e.g.*, *Jefferson*, 44 M.J. at 318. Appellant has not, however, demonstrated that the fact the military judge explained the law to the members and then asked them if they would follow the law somehow circumvented either of these purposes. Similarly, Appellant has cited no legal authority prohibiting the military judge from asking the questions that he did.

The thrust of the Defense's objection at trial was that when a military judge tells court members what is expected of them under the law, the members will tell the military judge they will rigorously follow the law, regardless of whether they actually intend to do so. This claim fails on various fronts. First, the parties gave the members lengthy and in-depth questionnaires to complete in advance of Appellant's court-martial. That is, the members were required to answer a litany of questions regarding their perspectives on such matters as burdens of proof, the weight of certain types of evidence, and punishment well before stepping into the courtroom and being asked anything at all by the military judge. As a result, the Defense already possessed an extensive amount of information about the members' views uninfluenced by any questions posed by the military judge. Second, once at the court-martial, the members each took an oath that they would truthfully answer questions relating to whether they should serve as members or not, and the parties were given substantial leeway to ask the members about their views on a wide variety of topics. Indeed, trial defense counsel even exhorted some of the members to pretend they were just "chatting" with counsel in a coffee shop. Appellant has not alleged any of the members answered any questions falsely or otherwise violated their oath, and we therefore conclude he had ample opportunity and ability to elicit the members' actual beliefs even after they were instructed on the law by the military judge. Third, to the extent the members may have felt compelled to agree with the military judge's explanation of what the law expected of them, the natural

extension of such a conclusion would be that the members would follow the law, as the military judge instructed them, and not that they would simply tell the judge what they thought he wanted to hear in voir dire and then go rogue once in the deliberation room. We think it more likely the members considered all the evidence they were presented, as the military judge told them they were required to do. Finally, the military judge was obligated to remove any members who were unwilling or unable to follow his instructions on the law, and the military judge's questions to the members directly sought to ascertain such willingness and ability. *See Morgan*, 504 U.S. at 729–30 (discussing a "trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence") (internal quotation marks and citation omitted).

Only one member subject to this objection, SMSgt AK, sat on Appellant's court-martial, and the military judge's actual questioning does not support Appellant's premise. When trial defense counsel asked SMSgt AK how he would feel if someone were to "use their background . . . as a way to maybe get away with something or reduce their capability," SMSgt AK first said it was "hard to describe," but then settled on "distasteful." After being asked to clarify, SMSgt AK added, "Dishonest." Immediately thereafter, the military judge secured SMSgt AK's commitment to consider all the evidence presented. Importantly, SMSgt AK had not indicated he would *not* consider any particular piece or type of evidence prior to the military judge's questions, so we are not faced with a situation in which the member said one thing and then reversed course upon questioning by the military judge. Instead, trial defense counsel had negatively framed an ambiguous question about people using their background "as a way to maybe get away with something," which SMSgt AK unremarkably responded to disapprovingly. We have considered, and we reject, Appellant's contention the military judge's questions were improper or somehow undermined his ability to exercise his challenges, and we do not find the military judge abused his discretion.

### d. Trial Counsel's Questions

On appeal, Appellant continues his attack on trial counsel's voir dire questions, which he describes as "leading questions that conditioned the members to answer affirmatively vice providing truthful answers." Appellant also argues trial counsel asked questions which had not been divulged prior to the court-martial, as required by the military judge's scheduling order. The Government argues Appellant focused at trial on the nature of trial counsel's questions and thereby waived any post-trial complaint as to the timeliness of their submission. We find Appellant's position on neither front warrants relief.

An accused facing the death penalty is entitled to attempt, through voir dire, to identify which prospective members have already determined whether

or not to impose the death penalty prior to being presented with the evidence. *Morgan*, 504 U.S. at 736. In *Morgan*, the United States Supreme Court expressed doubt that simply asking members if they would be fair and if they would follow the judge's instructions would be effective in identifying "jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath." *Id.* at 734–35. Appellant invites our attention to *Morgan*, arguing it highlights the harm caused by trial counsel's questions. But *Morgan* involved a trial in which counsel were not permitted to conduct voir dire at all and in which the judge declined to ask an additional question posed by defense counsel: whether the jurors would automatically vote to impose the death penalty, regardless of the evidence. *Id.* at 723. Thus, *Morgan* stands for the proposition that an accused is entitled—at least in capital cases—to pose more specific questions to members beyond simply asking whether they will follow the law. *Morgan* does not, however, say anything about the timing of such questions, or that "follow the law" questions may not be asked by trial counsel or the military judge—much less that asking such questions somehow prejudices the defense's own voir dire. Appellant has not identified any precedent holding otherwise. Moreover, unlike the situation in *Morgan*, Appellant's trial defense counsel were afforded extensive opportunities both before and during his rehearing to ask detailed questions about the members' views on a wide variety of topics, such as whether or not they believed the death penalty was employed too frequently, whether they thought a victim's family member should be permitted to serve as a juror, whether they thought it was "fair" that the Government had to secure a unanimous verdict with respect to the death penalty, and so on.

While we acknowledge the general soundness of Appellant's theory that a potential member who has already promised either trial counsel or the military judge that he or she will consider all the evidence is unlikely to admit the contrary under questioning by defense counsel, there is no legal requirement the military judge or trial counsel forego their own questions in order to present the members to the Defense in an untouched state.[21] What is required is that the military judge permit the Defense to identify any disqualifying biases the members may hold, and we see no indication he did not do so. Instead, the military judge afforded the Defense broad latitude in submitting an extensive pretrial questionnaire to the members and to engage in extended and often hypothetical discussions with each member about an array of topics. We see no error in the military judge permitting trial counsel to ask the members

---

[21] Midway through voir dire, the Defense asked the military judge to direct the parties to alternate who would start individual questioning of each member to address this concern; the military judge declined to do so.

whether they would follow the law or the military judge instructing the members they were required to do so.

With regard to the timeliness of trial counsel's submission of voir dire questions, Appellant did not waive this issue, contrary to the Government's position on appeal, simply because his counsel did not present oral argument on that portion of his motion. True, the military judge did not address the matter in his oral ruling denying the defense motion, but the Defense did not seek clarification or reconsideration on that point. Considering the military judge's broad discretion to control voir dire, we conclude the military judge's denial encompassed the Defense's timeliness claim, and that he did not abuse his discretion either by not specifically addressing the matter or in denying the Defense's motion. In analyzing this issue, we note that the members' questionnaire responses were submitted the same day the parties' proposed voir dire questions were due. Therefore, it would seem somewhat obvious that any questions asked during voir dire about those questionnaire responses would be absent from the proposed voir dire questions without either a modification of the military judge's scheduling order or a requirement that the parties submit a supplemental proposed voir dire incorporating matters raised by the questionnaire responses. A substantial number of the questions ultimately asked during voir dire were rooted in the questionnaire responses, and we conclude one reasonable view would be to see those questions as permissible follow-up questions to information provided by the members in advance of the rehearing—questions which did not need to be disclosed in advance. Moreover, even if the military judge had failed to rule on this particular component of the Defense's claim, we conclude Appellant suffered no prejudice. Had the military judge wanted to enforce his scheduling order on this point, we are confident he would have done so by either disallowing trial counsel's questions or taking other appropriate action.

### e. Challenge of SMSgt AK

On appeal, Appellant argues the military judge erred by not granting the Defense's challenge of SMSgt AK. Appellant first renews his claim that SMSgt AK evinced a partiality in favor of members of law enforcement, pointing to SMSgt AK's questionnaire answer that he would more likely believe a witness who is a member of law enforcement because he believed "in general . . . law enforcement professionals are held to a higher standard and are considered honest and trustworthy." Appellant concedes SMSgt AK agreed during voir dire to weigh a law enforcement officer's testimony the same as he would any other witness's testimony, but argues SMSgt AK's other statements belie that agreement. Overall, Appellant's position is that SMSgt AK appeared poised to automatically give credit to any law enforcement witness prior to that witness testifying at all, so he held an actual bias. Appellant also argues that even if

SMSgt AK did not have an actual bias in favor of law enforcement, a reasonable observer would question the fairness of Appellant's sentence rehearing, especially in light of the fact testimony from nine law enforcement officers was introduced in the Government's case.

Having carefully reviewed SMSgt AK's questionnaire and voir dire responses, we are unconvinced. As the military judge noted, a general belief in the credibility of law enforcement personnel is by no means unusual, and SMSgt AK explained in his own words that he would need to "listen to all the information" before he assigned it any particular weight. SMSgt AK was repeatedly asked by trial counsel, trial defense counsel, and the military judge whether he would assess law enforcement witnesses the same as other witnesses, and SMSgt AK consistently said he would. Considering SMSgt AK's voir dire answers in conjunction with the fact he completed his questionnaire in somewhat of a vacuum without any clarification from the military judge or the parties, we conclude the military judge did not err in denying the Defense's challenge under theories of either actual or implied bias. With respect to Appellant's assertion that any bias in favor of law enforcement was prejudicial, we note that, of the nine witnesses Appellant references, seven of them did not appear at Appellant's rehearing—instead, their prior testimony was simply read to the members, which is to say the Defense did not challenge them via cross-examination during the rehearing. Although some of the prior testimony included cross-examination from Appellant's original court-martial, the cross-examination was almost entirely geared towards eliciting additional information about the investigation, and did not involve any attempts at impeaching any of the witnesses. Of the two law enforcement witnesses who testified at the rehearing itself, the Defense did not meaningfully attack the credibility of the first and did not cross-examine the second at all. In other words, the credibility of witnesses who were members of law enforcement was largely immaterial to the Defense's case.

On appeal, Appellant somewhat merges and reframes the so-called "mitigation impairment" and "mitigation nexus" arguments he made at trial. Appellant's main contention now is that SMSgt AK was biased with respect to mental health evidence under the theory he would only consider such evidence if it was "connected to the crime." To arrive at this conclusion, however, we would have to adopt a rather cramped and one-sided view of SMSgt AK's actual statements, and we decline to do so. SMSgt AK repeatedly stated he would consider the background and life circumstances of someone convicted of murder before deciding on a sentence, and he volunteered on several occasions his view that people are shaped by a variety of influences as they grow up. On his questionnaire, which he completed prior to the rehearing, SMSgt AK wrote that he did not believe such factors should be considered when determining a

punishment unless "a proven mental health condition associated with the issue" was shown. However, after the military judge told SMSgt AK he would have to consider all the evidence presented, SMSgt AK said he would do so, even later telling trial defense counsel, "if it's presented it will be considered." SMSgt AK also said he understood that mental health issues "do affect people and their decision making."

Taken as a whole, SMSgt AK's responses indicate he initially said that he believed a person's background would not factor into a decision on punishment, but once the military judge explained to SMSgt AK that he would have to consider all such matters, SMSgt AK said he would. We are disinclined to place a great deal of weight on what a lay person thinks should or should not qualify as evidence in extenuation and mitigation before that person is provided guidance from a military judge regarding the law on that point. The relevant question here is not what SMSgt AK subjectively thought the law was when he was filling out his questionnaire. Instead, the question under an implied bias theory is whether the public would perceive Appellant as receiving an unfair hearing as a result of SMSgt AK's service as a panel member. Once the military judge explained to SMSgt AK the scope of the evidence he was required to consider, SMSgt AK readily agreed he would consider all of it, and also said a person's upbringing and mental health would factor into his assessment—precisely what the public would expect him to do to ensure Appellant a fair hearing.

Finally, SMSgt AK's comment that he found it "distasteful" that a person might use their background "as a way to maybe get away with something or reduce their culpability" goes more to the weight he would give such evidence than whether or not he would consider it. What the law requires is that members be open to considering all the evidence in a case; what weight SMSgt AK ultimately decided to give such evidence, however, was squarely within his personal discretion. Because the military judge explained he factored the liberal grant mandate into his assessment, we give his ruling greater deference. Even considering the liberal grant mandate, we conclude the military judge did not err or abuse his discretion in rejecting the Defense's challenge to SMSgt AK.

### f. Challenge of MSgt SC

Appellant argues on appeal that the military judge committed error when he denied the Defense's challenge to MSgt SC, claiming the member exhibited actual and implied bias. Appellant concedes that MSgt SC agreed to consider all the evidence and follow the military judge's instructions, but he submits that MSgt SC indicated she came to the rehearing with the presumption that death was the appropriate sentence before hearing any evidence. From that

premise, Appellant argues MSgt SC was akin to a juror who would automatically vote for the death sentence, regardless of the evidence, and was therefore disqualified from service on the rehearing. We decline to make this leap of logic.

Before receiving any guidance from the military judge and before even understanding that Appellant's case was a rehearing which only pertained to sentencing, MSgt SC said she would vote for death in cases of premeditated murder regardless of the facts or law. However, as soon as she was asked to elaborate on that response during voir dire, MSgt SC said that her understanding was that she would be "weighing all of the evidence" and then determining whether the death penalty was appropriate or whether there was "a consequence or rehabilitation possibility." At no time during voir dire did MSgt SC suggest she would automatically vote for the death penalty. Rather, she said that based solely on the charges—without knowing more—she "would probably be leaning more towards the death penalty," but she also said that was not "necessarily automatic." When asked again if she thought the death penalty should be automatically adjudged in Appellant's case, MSgt SC said it "probably" should, but she added a critical caveat: "because I don't know anything else." After her obligation to consider all the evidence was explained to her, MSgt SC said she understood that "all options are still available" until she hears all the evidence. When trial defense counsel questioned her, MSgt SC again said that based solely on the charges, she felt the death penalty was appropriate, but she reiterated that was only true because she knew nothing else about the case and added that if she was able to hear evidence and ask questions, "then that's going to persuade." She explained again she would not make a decision until she had heard all the evidence, and she offered up types of evidence which she felt would warrant a punishment less severe than death. She specifically mentioned rehabilitation potential, mental illness, and remorse—all three of which the Defense later offered in Appellant's case.

Contrary to Appellant's claim that MSgt SC arrived at Appellant's court-martial with the intent to impose death regardless of the evidence or the law, MSgt SC explained that—considering the charges without the benefit of any evidence—she felt that the offenses warranted the death penalty, but that when given evidence, she would carefully consider it before deciding on an appropriate punishment.

Appellant was not entitled to a panel of members entirely devoid of opinions about the relative severity of offenses or the appropriateness of certain forms of punishment. Instead, Appellant was entitled to an impartial and unbiased panel; that is, a panel composed of members who would consider the evidence in accordance with the military judge's instructions prior to arriving at a judgment. As MSgt SC repeatedly said during voir dire, her views on the

appropriateness of the death penalty hinged on the fact she had received no evidence, but once she heard evidence, she would consider it in determining an appropriate sentence. Not only did MSgt SC demonstrate that she did not intend to automatically vote for the death penalty, we are convinced a person observing Appellant's court-martial would not conclude he received something less than a fair hearing by virtue of having a panel with MSgt SC on it.

We are similarly unpersuaded by Appellant's argument that MSgt SC did not understand the concept of the burden of proof. She acknowledged she was unfamiliar with such legal principles, but once the military judge explained to her that she was bound to consider evidence regardless of which party offered it, and that only the Government had the obligation to prove the matters required to adjudge the death penalty, MSgt SC indicated she understood and would follow those instructions. Regardless of MSgt SC's understanding of what a technical definition of "burden of proof" might be prior to Appellant's court-martial, the real issues were whether she understood the law as the military judge instructed her and whether she would follow those instructions. She told the military judge she did and she would, and we see nothing in the record warranting a contrary conclusion. Additionally, Appellant does not reassert on appeal his trial claim that MSgt SC was generally disinclined to follow directions. We conclude the military judge neither erred nor abused his discretion in declining to excuse MSgt SC on actual or implied bias grounds.

### g. Challenge of SMSgt ML

On appeal, Appellant contends the military judge erred in not excusing SMSgt ML for actual and implied bias.[22] His argument is that despite SMSgt ML stating she would consider Appellant's background in arriving at an appropriate sentence, "the totality of her answers reveal a fundamental misunderstanding about her willingness to listen to certain evidence and her responsibility to meaningfully consider it." We take a different view and conclude SMSgt ML did not suggest she would not consider evidence about Appellant's background, but instead indicated she was not likely to give it a great deal of weight. We pause to note that it is not an unreasonable view, especially for someone who is not an expert in the criminal justice system, to be skeptical of the notion that some aspect of an accused's childhood might have any obvious bearing on a sentence for crimes he or she commits as an adult. SMSgt ML alluded to this view when she discussed the prior court-martial she served as a member on, wherein she assessed some amount of testimony from family members as not "hav[ing] to do with the case." But, significantly, SMSgt ML

---

[22] At trial, Appellant only challenged SMSgt ML on implied bias grounds. The military judge, however, ruled on both actual and implied bias bases.

explained that even though she took a dim view of the relevance of the information, she understood she was required to weigh the evidence "based on the importance with the other evidence." In other words, SMSgt ML expressed that she would consider the evidence, even if its relevance was not particularly obvious. She elaborated that in such a case, she would "need to figure out how to weigh that information," which demonstrates SMSgt ML not only understood she was required to consider all the evidence in the case, but that she would be called upon to assign a weight to that evidence in order to determine an appropriate sentence. She reemphasized this point when she explained that "[n]one of [the evidence] would never have a weight because if it's presented to us, then obviously I have to consider it"—that is, there was no evidence she would reject from the outset.

Appellant was entitled to a panel of fair and impartial members willing and able to follow the military judge's instructions and not possessing an inelastic attitude with respect to a particular punishment. *See, e.g.*, *United States v. Schlamer*, 52 M.J. 80, 93 (C.A.A.F. 1999) (citation omitted). Appellant was not entitled to a panel of members committed to viewing the evidence with the particular weight he believed it deserved. We also see no indication the military judge failed to adhere to the liberal grant mandate with respect to SMSgt ML, or any of the other challenged members, as evidenced by the fact he granted 13 challenges to the 25 potential members and denied only four—one of which was a Government challenge. Even assuming Appellant preserved his challenge for actual bias, we conclude the military judge did not abuse his discretion or otherwise err in denying the Defense's challenge of SMSgt ML.

## C. Evidence Regarding Ms. JM's Skirt

Appellant argues the military judge erred by: (1) permitting the Government to introduce evidence about the removal of a skirt worn by Ms. JS, one of Appellant's victims; (2) instructing the members that the fact the skirt was removed was an aggravating circumstance[23] related to Appellant's offenses; and (3) allowing the Government to argue Appellant removed the skirt for a sexual purpose.[24] We disagree with Appellant on all three points.

---

[23] In his assignment of error, Appellant states this error pertains to an "aggravating factor," a term of art in death penalty litigation we discuss later in this section. Based upon his exposition on his claim of error, however, we conclude Appellant intended to describe this as an "aggravating circumstance," and we reframe his assignment accordingly. We have further reframed this assignment based upon assertions he has made beyond the heading of the assignment itself.

[24] See Appendix, AOE VIII.

### 1. Additional Background

Appellant had been socializing with SrA AS and Ms. JS along with others the evening of 3 July 2004. At some point that evening, Appellant and Ms. JS were alone and Appellant attempted to kiss Ms. JS. She rebuffed his advances, and the two went their separate ways. SrA AS, Ms. JS, SrA JK, and SrA JK's wife spent the next day together cooking out, drinking, and socializing at SrA JK's on-base house. Late that night, after SrA JK's wife had gone to bed, Ms. JS decided to tell SrA AS and SrA JK about Appellant trying to kiss her. This led to SrA AS and SrA JK making a series of heated phone calls to Appellant which included threats to both beat up Appellant as well as to report him to military officials for not only attempting to kiss Ms. JS but also for being involved with some other non-specific, but allegedly improper, relationship. Appellant, who lived off-base, put on his military fatigues, drove on base, and hid in bushes behind SrA JK's house where he could observe SrA AS, Ms. JS, and SrA JK.

At some point, the three decided to go to SrA AS's on-base house, and Appellant followed. Shortly thereafter, the Government contended, Appellant entered the house, and a scuffle ensued between Appellant and SrA AS in which Appellant stabbed SrA AS with a combat-style knife. SrA JK intervened, and Appellant stabbed SrA JK multiple times as SrA JK tried to disengage and leave the house. SrA JK succeeded in getting outside, but Appellant followed him and stabbed him again. Appellant left SrA JK, went back inside SrA AS's house, and killed both SrA AS and Ms. JS. Despite his wounds, SrA JK was able to make his way to a neighbor's house and seek help.

The Government's theory at the rehearing was that Appellant first stabbed SrA AS such that SrA AS was paralyzed but still conscious, so that when Appellant attacked Ms. JS a short distance away, SrA AS was forced to watch helplessly. The Government further theorized that Appellant killed Ms. JS in a back bedroom before returning to SrA AS and killing him. During the rehearing, the Defense disputed details of this proposed sequence of events regarding the attacks as well as the claim that SrA AS saw Appellant attack his wife.

After he killed SrA AS and Ms. JS early in the morning of 5 July 2004, Appellant left the house and threw his knife into a neighbor's yard before driving back off base and returning home. When medical responders and military law enforcement personnel entered SrA AS's house, they found Ms. JS's body behind the door of the back bedroom, out of the line of sight where SrA AS's body was found. She was still wearing her shirt and panties, but the denim skirt she had been wearing earlier in the evening was laying on the floor a few feet from her body, unbuttoned and unzipped. Subsequent analysis determined the skirt had a large blood stain on the back and a smaller, fainter blood stain near the front button. There was no evidence indicating specifically when Ms.

JS's skirt was taken off or who took it off, although the blood stain on the back of the skirt and other aspects of the crime scene suggested the skirt was removed after she had been stabbed at least once—as the stain indicated her blood had flowed downwards into the skirt fabric—but before Appellant completed his attack. The Government contended SrA AS would have seen Ms. JS without her skirt on at some point during the attack.

Later that day, Appellant was riding in a vehicle driven by one of his friends. The friend decided to stop by SrA AS's house to see SrA AS and Ms. JS, unaware they had been killed. Once they arrived, law enforcement agents on the scene became suspicious of Appellant and took him in for an interview—during which Appellant confessed to the attacks. Appellant told investigators he stabbed SrA JK and SrA AS, then killed Ms. JS, and then returned to SrA AS to kill him. Appellant assisted the investigators in locating the knife and the clothes he had been wearing, but he never mentioned Ms. JS's skirt.

Via pre-rehearing motions, the Defense sought to preclude the Government from presenting evidence or argument with respect to the removal of Ms. JS's skirt, even though the fact Ms. JS was not wearing her skirt when her body was found had been proven during the findings portion of Appellant's original trial. The Defense further sought to preclude the Government from arguing that Appellant either attempted to sexually assault Ms. JS or had some sexual motive in attacking her. The Government opposed both motions.

In order to obtain the death penalty, the Government must prove, beyond a reasonable doubt, the presence of at least one "aggravating factor." R.C.M. 1004(c). Pertinent here, the Government sought to prove that the murder "was preceded by the intentional infliction of substantial physical harm or prolonged, substantial mental or physical pain and suffering to the victim." R.C.M. 1004(c)(7)(I). Part of the Government's theory was that Appellant inflicted mental pain on SrA AS by attacking his wife in front of him as she was only wearing her underwear below her waist, while he was paralyzed and unable to intervene. Trial counsel also told the military judge the Government intended to argue that SrA AS may have believed Appellant was raping Ms. JS during the portion of the attack occurring in the bedroom, where SrA AS would not have been able to see either Appellant or Ms. JS.

The Defense, meanwhile, contended that evidence regarding the skirt would invite the members to speculate that Appellant sexually assaulted Ms. JS or attempted to do so, in spite of the lack of direct evidence of any contemplated, attempted, or completed sexual assault. Seemingly acknowledging that some evidence regarding the skirt would be permitted, trial defense counsel asked the military judge to block the presentation of "excessive skirt testimony."

The military judge ruled that evidence of the removal of Ms. JS's skirt after she was initially stabbed was relevant and admissible as evidence in aggravation under R.C.M. 1001(b)(4) insofar as it tended to show Appellant continued his attack on Ms. JS while she was in her underwear, which Ms. JS was "certainly aware" of and SrA AS was "likely aware" of. Further, the military judge concluded the intervening removal of the skirt provided some evidence of the length of time spanned by the attack—that is, how long Ms. JS suffered before Appellant finally killed her. The military judge determined that there was "sufficient evidence to infer that [Appellant] is the person who removed the skirt, [but] it frankly does not matter" who removed it, because the fact she was being attacked in her underwear "adds to the psychological trauma that [Ms. JS] and [SrA AS] would have experienced." The military judge further concluded the evidence was relevant and admissible to prove the alleged aggravating factor regarding pain and suffering under R.C.M. 1004(c)(7)(I).

In performing his Mil. R. Evid. 403 analysis, the military judge explained the probative value of the evidence was high because of its direct relation to the impact on the victims, as well as it being directly related to the facts of the case. The military judge found that the risk of unfair prejudice was low and what risk there was could be cured through a limiting instruction, should the Defense request one. Based upon this analysis, the military judge declined to prohibit the Government from presenting additional evidence about the skirt or the impact it may have had on the victims.

The military judge did, however, prohibit trial counsel from arguing that Appellant attempted to commit any sexual misconduct against Ms. JS when he attacked her on 5 July 2004. He further prohibited trial counsel from making any argument that Appellant had a "sexual purpose" for removing the skirt, in part because the Government never provided notice of a sexual offense prior to Appellant's original trial.

During opening statements, trial counsel told the members Appellant stabbed Ms. JS and then, "before receiving additional stab wounds," her skirt was "removed and tossed to the side." Various Government witnesses testified about the skirt, such as the fact Ms. JS had been wearing it earlier in the evening, where it was found, and the condition it was in. The pathologist testifying for the Government said she believed the blood stain and Ms. JS's wounds indicated Ms. JS was wearing the skirt when she was initially stabbed by Appellant, but not when she was subsequently stabbed—a view also held by the Government's bloodstain-pattern analysis expert. An agent from the Air Force Office of Special Investigations testified that the skirt was stained with blood, but did not appear to have been ripped, torn, or otherwise damaged. Although trial counsel did not make any explicit comments about Appellant attempting

to sexually assault Ms. JS, they did present testimony from Appellant's original trial that Appellant underwent a sexual assault examination during the investigation.[25] Trial counsel also presented testimony from that trial in which a second witness made a reference to "the sexual assault kit" without specifying whether that was from an examination of Appellant or Ms. JS. Trial defense counsel did not object to either reference to sexual assault examinations.

Other than those two references, no witness testified about the possibility of either a sexual assault or a sexual motive on Appellant's part. On appeal, Appellant points to a comment made by one of SrA AS's brothers, who was a Federal Bureau of Investigations special agent, in which he volunteered in his testimony, "my brother knew what was going on in that house, and there is an ungodly amount of evidence to prove that." The comment was not in response to any question by trial counsel; trial defense counsel promptly objected, and the military judge both sustained the objection and told the members to disregard the comment.

Later in the rehearing, the military judge and the parties discussed proposed sentencing instructions. Trial counsel asked the military judge to identify specific matters in aggravation for the members to consider, which the military judge and the parties referred to as "aggravating circumstances." The Defense objected to several of these proposed aggravating circumstances, to include one that stated Ms. JS's skirt was removed during the commission of the offenses. Trial defense counsel argued the instruction was "raising this inference of some kind of sexual motive or sexual intent, or that [Appellant] is the one who removed the skirt." Trial counsel argued the fact the skirt had been removed pertained to "the emotional impact, the emotional distress" suffered by the victims. The military judge agreed with the Government, noting that the skirt's removal was relevant to the alleged aggravating factor and that it was "generally an aggravating circumstance that the murder occurred while she was in that particular state." The military judge then reminded trial counsel that they were not permitted to argue that Appellant had sexually assaulted Ms. JS, that he attempted to do so, or that he had any sexual motive. In his final instructions to the members, the military judge listed 11 aggravating circumstances the members "may" consider, to include "[e]vidence that [Ms. JS's] skirt was removed during the commission of the offense."

The military judge also gave the members a limiting instruction with regard to evidence about the skirt:

> You have heard some evidence regarding the removal of [Ms. JS's] skirt during the commission of the offenses. The accused

---

[25] This testimony was read into the record from the transcript of the original trial.

was not charged with committing, or attempting to commit, any sexual offense against [Ms. JS]. You may consider evidence relating to the removal of [Ms. JS]'s skirt in determining whether the [G]overnment has proven the alleged aggravating factors, and as a possible aggravating circumstance. You may not consider this evidence as an allegation or proof of a sexual offense. Again, I remind you the accused is to be sentenced only for the offenses of which he has been found guilty.

In the Government's sentencing argument, trial counsel made a number of references to the skirt, such as: "[W]e know her skirt was removed;" "Did he take it off? Did he force her to take it off? How long? How long did that last?"; "[H]e stabs her in that hallway with her skirt off. With her skirt off;" and "He was in uniform. Her skirt was removed." In the Defense's argument, trial defense counsel posited Ms. JS might have taken the skirt off herself to locate or examine her wound and pointed to a lack of thorough DNA testing of the skirt.

**2. Law**

A military judge's decision to admit evidence is reviewed under the abuse of discretion standard. *Finch*, 79 M.J. at 394 (citation omitted). Relevant evidence is generally admissible, and evidence is relevant when it has the tendency to make a fact of consequence more or less probable. Mil. R. Evid. 401 and 402. Under R.C.M. 1001, the Government may present evidence in aggravation during the sentencing portion of an accused's court-martial. Evidence in aggravation includes that which pertains to "any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty" and includes such matters as the psychological impact of the accused's offenses on a victim. R.C.M. 1001(b)(4). This rule requires the prerequisite showing that an accused caused a specific harm, which imposes a higher standard than "mere relevance." *United States v. Rust*, 41 M.J. 472, 478 (C.A.A.F. 1995) (citations omitted).

Evidence qualifying under R.C.M. 1001(b)(4) must also pass muster under Mil. R. Evid. 403. *United States v. Hardison*, 64 M.J. 279, 281 (C.A.A.F. 2007). Under that rule, a military judge may exclude evidence if its probative value is substantially outweighed by such considerations as its tendency to result in unfair prejudice, confuse the issues, or mislead the members. A military judge has "wide discretion" in applying Mil. R. Evid. 403, and we exercise "great restraint" in reviewing such applications when the military judge articulates his or her reasoning on the record. *United States v. Humpherys*, 57 M.J. 83, 91 (C.A.A.F. 2002) (citations omitted).

In order to adjudge the death penalty, the members must not only find the existence of one of the aggravating factors under R.C.M. 1004(c), they must

also concur that any extenuating or mitigating circumstances in the case are substantially outweighed by any aggravating circumstances admissible under R.C.M. 1001(b)(4). R.C.M. 1004(b)(4)(C); *see also United States v. Loving*, 41 M.J. 213, 278 (C.A.A.F. 1994).

When an appellant preserves an allegation of error with respect to a military judge's instructions, we review the adequacy of those instructions de novo. *United States v. Dearing*, 63 M.J. 478, 482 (C.A.A.F. 2006). Military judges have "wide discretion" in fashioning instructions, but those instructions must "provide an accurate, complete, and intelligible statement of the law." *United States v. Behenna*, 71 M.J. 228, 232 (C.A.A.F. 2012) (citations omitted).

### 3. Analysis

We first turn to Appellant's contention that the military judge erred by permitting the Government to present evidence of Ms. JS's skirt being removed during the attack. Appellant generally argues the matter had low probative value, and whatever probative value it had was substantially outweighed by the danger of unfair prejudice—that is, the threat the members would assume Appellant intended or attempted to sexually assault Ms. JS. *Res gestae* evidence—evidence which is part and parcel of an offense—is generally admissible insofar as it "enables the factfinder to see the full picture so that the evidence will not be confusing and prevents gaps in a narrative of occurrences which might induce unwarranted speculation." *United States v. Metz*, 34 M.J. 349, 351 (C.M.A. 1992). In this case, the members were presented with not only crime scene photographs depicting both Ms. JS's body without her skirt on and the blood-stained skirt itself, but also detailed evidence supporting theories about how the attacks unfolded. In our view, omitting evidence of the skirt itself, to include when it was likely removed, would have created far more confusion and squarely invited speculation by the members as to why Ms. JS was not wearing her skirt when her body was found. Moreover, the fact her skirt was removed at some point during the attack does provide insight into the length of Appellant's entire attack, which is to say, the amount of physical suffering Appellant inflicted upon Ms. JS before she died. It is also an indication of mental suffering she may have endured, as Ms. JS may have been all the more terrorized by the removal of an article of her clothing during Appellant's attack. Members very well may have concluded that Appellant took Ms. JS's skirt off her and that she spent her last moments trying to understand his reasons for doing so.

In short, the removal of Ms. JS's skirt during the attack—regardless of how it occurred—is squarely the type of evidence in aggravation contemplated by R.C.M. 1001(b)(4), as it demonstrated the pain and suffering Appellant inflicted on one of his victims beyond the sheer brutality of his offenses. To the extent there was a danger of the members misusing this evidence to inject a

sexual offense into Appellant's case, the military judge told the members they could not use the evidence for that purpose. Without any evidence to indicate otherwise, we presume the members followed the military judge's instructions. *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citations omitted). We also note that the Government largely followed the military judge's ruling prohibiting trial counsel from raising the specter of sexual assault. Although trial counsel did introduce two statements indicating a sexual assault examination had been conducted—the relevance of which is not at all apparent from the record—those were two isolated statements during a lengthy rehearing and were introduced without objection from the Defense.[26] Given the brief and isolated nature of these statements, we conclude the military judge's limiting instruction to the members served to neutralize any potential unfair prejudice they may have had. Meanwhile, SrA AS's brother's testimony that there was "an ungodly amount of evidence to prove" that SrA AS "knew what was going on in that house" was too vague for us to give it the import Appellant calls upon us to give it. SrA AS's brother may have been suggesting Appellant attempted to sexually assault Ms. JS, but he also may have been suggesting that SrA AS was still alive and paralyzed on the ground while watching Appellant kill his wife. In any event, the Defense's objection to the comment was sustained, and the members were told to disregard it almost immediately after SrA AS's brother made it. In light of the foregoing, we conclude the military judge did not abuse his discretion by admitting evidence of Ms. JS's skirt, and the military judge's limiting instruction properly constrained the members' use of the evidence.

Appellant's next contention—that the military judge erred in instructing the members they could consider evidence that Ms. JS's skirt was removed during the offense as a matter in aggravation—is similarly unpersuasive. This aggravating circumstance was among 11 the military judge highlighted for the members, which included such other matters as the mental and physical pain suffered by SrA JK, the nature of the weapon Appellant used, and the fact the offenses occurred in base housing. Notably, these aggravating circumstances in the military judge's instructions were followed by 26 extenuating or mitigating circumstances requested by the Defense. Because the Government was seeking the death penalty, the members had to determine whether or not extenuating or mitigating circumstances were substantially outweighed by aggravating circumstances in the case in accordance with R.C.M. 1004(b)(4)(C). Thus, the issue of the need to weigh these circumstances was directly before

---

[26] Because the statements were from prior trial testimony and marked as appellate exhibits, the Defense was on notice of the statements in advance of them being read to the members.

the members and was an appropriate matter for a judicial instruction. Although military judges are not necessarily under any obligation to specifically identify discrete circumstances in aggravation or in extenuation and mitigation, doing so is not uncommon, especially in the context of capital litigation. *See, e.g.*, *Loving v. United States*, 68 M.J. 1, 8–9 (C.A.A.F. 2009). Considering the degree of scrutiny of such cases, it seems entirely reasonable for a military judge overseeing a capital trial to explicitly specify such circumstances so that there is no later question as to what circumstances were considered by the members. Therefore, we conclude the military judge committed no error in instructing the members that the removal of Ms. JS's skirt was an aggravating circumstance which they could consider.

Finally, we have carefully reviewed the Government's closing argument and rebuttal argument, and we disagree with Appellant's claim that trial counsel argued Appellant removed Ms. JS's skirt for a sexual purpose. The Defense only objected twice during the Government's arguments, and neither objection pertained to the skirt. On appeal, Appellant argues "the connotation was clear from [trial counsel's] argument" that Appellant intended to sexually assault Ms. JS, and that trial counsel "insinuated" that SrA AS believed Ms. JS had been or was about to be sexually assaulted. We do not see any such connotations or insinuations. Rather, trial counsel argued—in accordance with the military judge's earlier ruling—that the fact Ms. JS's skirt had been removed may have made Appellant's attack all the more traumatizing for SrA AS and Ms. JS while they were still alive. This argument was proper and directly drawn from the evidence, and the military judge did not err by not *sua sponte* interrupting the argument.

## D. Cross-Examination Lacking Good Faith Basis

The Defense sought to portray Appellant as a model prisoner at the United States Disciplinary Barracks, where he had been incarcerated since his original court-martial. Trial counsel, meanwhile, attempted to characterize Appellant's prison conduct as less than exemplary by asking one of the Defense's witnesses whether or not he was aware of misconduct purportedly committed by Appellant. On appeal, Appellant contends trial counsel lacked a good faith basis for asking the questions and thereby committed prosecutorial misconduct by doing so.[27]

### 1. Additional Background

Mr. JL, a licensed clinical social worker, had been the Disciplinary Barracks' chief of assessment and was responsible for determining what risks in-

---

[27] See Appendix, AOE VI.

mates posed. He also became Appellant's counselor when Appellant transitioned from death row to the prison's general population in September 2016 after Appellant's death penalty was set aside by the CAAF, and he remained Appellant's counselor until he retired in November 2017. He described his role as "[d]ay-to-day case management, helping the people adjust, get along, make changes." He explained the opportunities prisoners have, the prison's disciplinary tools, and the informal hierarchy that existed among the prison population. He testified Appellant purposely sought to avoid disrupting that hierarchy when he was transferred to the prison's general population and participated in every program offered as soon as he was able to.[28] During his incarceration, Appellant received only a single disciplinary report. The report arose from him retaining tobacco products he had purchased from the prison commissary in his cell in 2008 after the Disciplinary Barracks adopted a facility-wide no-smoking policy. Mr. JL characterized the infraction as "very minor" and described Appellant as "certainly cooperative, very compliant. Follows the rules. Very eager to get involved in programs. Very motivated to figure out behaviors, and why he's in the situation he's in, why he did what he did."

Trial defense counsel asked Mr. JL whether Appellant had told him about "kind of a run-in he had with one of the other inmates, and an argument he had with him about who might run the pod" that Appellant was assigned to. Mr. JL agreed Appellant had, but said,

> [M]y take of it was the other inmate was intimidated. [Appellant] was not in a position where he was trying to take over, gain any power, any position in that respect. And was just wanting to go in there and be part of the unit. He wasn't as—he wasn't demanding to sit in the front row, if you will, or anything of that nature.[29]

At some later point, Appellant was moved to a different pod of prisoners. According to Mr. JL, Appellant would have received a disciplinary report if any incident "turned physical or violent, or even if it was loud—yelling or what have you."

---

[28] While on death row, Appellant had far fewer opportunities to interact with other prisoners or to participate in programs offered by the prison. Although the members serving on the rehearing panel were made aware that Appellant had been subjected to some form of restricted incarceration prior to entering the general population, the fact Appellant had been previously sentenced to death and placed on death row was not revealed to them.

[29] When watching television, prisoners with higher status among the inmates get to sit in the front row of seats.

On cross-examination and without objection, trial counsel asked Mr. JL if he was aware that once Appellant was in the new pod that Appellant had approached Inmate RC and "got into a shouting match" over whether Appellant should be allowed to be "the front row center." Mr. JL said he was unaware of this. The Defense subsequently called Inmate TS from this same pod who testified Appellant had told a particular inmate to stop attempting to exert so much control over the other inmates, but this simply amounted to a conversation, not an argument. Trial counsel asked Inmate TS whether this incident stemmed from Appellant wanting to sit in the front row, but Inmate TS said it had not. Another inmate said he had heard about a "conflict" between Appellant and two other inmates, but he provided no detail beyond acknowledging his awareness.

Trial counsel also raised the suggestion Appellant had acted inappropriately on another occasion by asking Mr. JL whether he had been approached by other staff members who expressed concern about Appellant's "aggressive interaction with a female biology instructor." Mr. JL said he had been so approached. Trial counsel asked whether Appellant "was angry about a grade he received on the first exam and confronted [the instructor] in a very aggressive manner." Mr. JL answered affirmatively. Both questions were asked without objection.

The Defense, however, called the biology professor who flatly rejected trial counsel's characterization, testifying that Appellant approached her after the exam to tell her he thought she was teaching the class at a graduate level. She said he "tapped the desk [and] waived his finger at [her] a little bit." Concerned Appellant was struggling with the material and that he may not have known he could drop the class at that stage without financial or academic penalty, she called the prison's academic point of contact, Mr. MM, to see if Appellant understood his options in this regard. The professor not only testified she did not feel threatened, but that she was "still very angry" the matter was discussed beyond giving Appellant advice about his options. She also said she was "disappointed" to hear Appellant's conduct had been described as aggressive. The professor explained she gave Appellant a copy of one of her graduate-level exams for him to look at, after which Appellant apologized to her and the quality of his work "increased drastically" by the end of the semester. Mr. MM testified that he personally did not see Appellant's conduct as inappropriate, but that "someone" perceived it as overly aggressive.

In prison records admitted into evidence by the Defense, one of Mr. JL's counseling entries notes Appellant told Mr. JL that "he reacted to the instructor, venting his frustration about the test," but that "he did not believe he was overreacting or was in any way threatening towards her." Mr. JL further wrote in his notes:

> Discussed with [Appellant] his recent interaction with his biology instructor. Staff members from [the prison's Directorate of Correctional Programs] approached this counselor and were concerned about [Appellant's] aggressive interaction with the instructor. The staff members were told by the instructor that [Appellant] was angry about the grade he received on the first exam and confronted her about the exam in what she thought was a very aggressive manner. When this information was relayed to [Appellant] he was surprised. He did not believe he came across this way at all. . . . He stated he appreciated the feedback [ ]and will be more aware of this [in] interactions with her in the future.

Later in the rehearing, the military judge instructed the members that asking witnesses "have you heard" type questions was a permissible method of testing a witness's opinion and to enable the members to assess what weight the witness's testimony should be given. The military judge further explained, "If the witness admits knowledge of the matter, then you may also consider the question and answer to rebut the opinion given. . . . The question may only be considered for the limited purpose I stated."

None of these matters was referenced in the Government's sentencing argument; however, as discussed in greater detail in Section II(H), *infra*, of this opinion, trial counsel did ask the members what risk they would accept on a confinement officer's behalf if they did not sentence Appellant to death.

**2. Law**

Counsel may test a witness's opinion regarding the character of another person by asking "have you heard" or "are you aware" type questions which refer to specific instances of conduct—as long as there is a good faith basis for asking the question, and the question is otherwise permissible under the rules of evidence. *United States v. Saul*, 26 M.J. 568, 572 (A.F.C.M.R. 1988). The specific instances themselves are not offered to prove they did or did not occur, but rather to evaluate the proffered opinion. *United States v. Beno*, 324 F.2d 582, 588 (2d Cir. 1963); *see also United States v. Anderson*, No. ACM 39141, 2018 CCA LEXIS 122, at *5 (A.F. Ct. Crim. App. 28 Feb. 2018) (unpub. op.).

**3. Analysis**

Appellant argues the Government attempted to portray him as "a violent, aggressive person" by asking misleading "have you heard" questions about events characterized by competing narratives or lacking evidentiary support. The main topics at issue here are the claims of confrontations between Appellant and other inmates and his interaction with his biology instructor.

Because Appellant did not object at trial to trial counsel's questions about his alleged confrontations with the other inmates, Appellant forfeited this issue, and we review for plain error. Due to the lack of a trial objection, we are somewhat hampered in our ability to assess what, if anything, formed the basis for trial counsel's suggestion that Appellant was embroiled in "a shouting match" regarding Appellant being "the front row center." It was clear from the testimony that Appellant had conversations and likely disagreements with at least two other inmates, but Mr. JL disavowed any knowledge of the situation trial counsel propounded, and no witness supported the version of events suggested by trial counsel.

Regardless of whether trial counsel had a good faith basis for asking the question, we conclude Appellant was in no way prejudiced for two reasons. First, the military judge told the members they could only consider the Government's questions if the witness admits to knowing about the matter, which Mr. JL did not do. Unless there is evidence to the contrary, we will presume court members follow the instructions they are given by the military judge. *United States v. Stewart*, 71 M.J. 38, 42 (C.A.A.F. 2012) (citing *Taylor*, 53 M.J. at 198). Thus, the members should have ignored trial counsel's question to Mr. JL, and we see nothing to indicate that they did not do so. Second, even if the members did not and improperly concluded from the question that Appellant had gotten into a heated argument about the informal prisoner hierarchy, we find it implausible such a conclusion would have had any impact on the members' assessment of an appropriate sentence. That prisoners confined in close proximity to each other in a highly restrictive setting may have arguments—even heated ones—from time to time is hardly unexpected. Given the vastly more severe character of Appellant's charged offenses, any jailhouse arguments not significant enough to warrant intervention by the prison's staff could not reasonably be expected to have had any impact on the members' decision to not grant him a sentence involving the possibility of parole.

With respect to trial counsel's questions about Appellant's interaction with his biology professor, we conclude trial counsel had a good faith basis for his questions about this episode, and therefore we do not find prosecutorial misconduct. Because both Mr. JL and Mr. MM testified that at least someone on the prison staff was concerned Appellant had acted aggressively toward the professor, and Mr. JL's clinical notes offered in evidence by the Defense corroborate this, trial counsel had some basis for framing the question as they did, despite the fact the professor and Mr. MM saw the situation differently. Thus, we disagree with Appellant's contention that trial counsel lacked a good faith basis for asking the questions in the first place. Nevertheless, even if we were to conclude trial counsel lacked a good faith basis for asking about an "aggressive interaction," we would find no prejudice to Appellant in light of his attor-

neys' effective evisceration of the suggestion Appellant had behaved inappropriately. The professor's own testimony, along with the absence of disciplinary action and the fact Appellant stayed in the biology class, apparently successfully completing the semester, all substantially undermined the Government's attempts to frame the episode as misconduct. As a result, even if there was error here, the likelihood of the members drawing any negative connotation from trial counsel's questions was remote. If anything, Appellant's case was potentially bolstered by trial counsel's efforts, which demonstrated how far the prosecution team had to reach to imply Appellant was a problematic prisoner. The fact trial counsel did not reference the matter in the Government's sentencing argument suggests they also determined the claim was not worth revisiting.

**E. Demonstrative Aid Used in Dr. TR's Cross-Examination**

Appellant argues the military judge erred by permitting trial counsel to display several slides during the cross-examination of a defense expert witness, because the slides contained information which was never admitted into evidence.[30] We disagree.

**1. Additional Background**

The Defense called Dr. TR, an expert in the field of "prison risk assessment and inmate adjustment," to testify that—in his opinion—Appellant had adapted well to life in prison and posed a low probability of engaging in violent behavior while incarcerated. The Defense also admitted a report prepared by Dr. TR detailing his assessment of Appellant. The report indicates Dr. TR arrived at his opinion by considering: his interview with Appellant; his review of Appellant's prison record; his tour of the Disciplinary Barracks; briefings and interviews which Dr. TR participated in regarding the facility's population, policies, and procedures; and his review of "capital risk assessment scientific literature."[31] Significantly, Dr. TR explained in his report that he was asked to evaluate Appellant's risk of committing violence in confinement in the event he was sentenced to life without the possibility of parole.

Dr. TR testified that one challenge facing the scientific community in predicting future dangerousness of prisoners is that prison violence is relatively rare and is perpetrated by only a small percentage of inmates. He said that violence in the Disciplinary Barracks was minimal and rarely aggravated, and that there had only been a single case of a prisoner murdering another in the

---

[30] See Appendix, AOE IX.

[31] The version of the report admitted into evidence did not include citations to the studies and articles Dr. TR relied upon, but the parties possessed a version of the report which did.

prison's history. Dr. TR testified that prisoners serving sentences to life without the possibility of parole are generally better behaved in prison than those with other sentences; that the severity of a prisoner's violence which originally resulted in his or her incarceration is not a good predictor of whether that prisoner will be violent in prison; and that a prisoner's propensity for violent jailhouse misconduct diminishes as he or she ages.

In assessing Appellant, Dr. TR noted the Disciplinary Barracks staff considered Appellant to be "a model inmate," and that he had "continually and successfully participated in available programming, ongoing treatment, daily work, continued education, and [had] received consistently positive appraisals by [Disciplinary Barracks] staff." Dr. TR highlighted that Appellant had no violent infractions in his more than 12 years of incarceration and that his age of 35 at the time of his assessment made him statistically less likely to engage in prison misconduct of any sort. Dr. TR also explained Appellant's custody level had been upgraded twice, granting Appellant relief from certain prison restrictions.

During Dr. TR's direct examination, trial defense counsel used a series of 32 slides as a demonstrative aid. The slides contained a mixture of prison-violence statistics, risk-assessment concepts, and information specifically related to Appellant, including a summary of Dr. TR's conclusions. Various slides included citations to different articles; however, these citations were not discussed during the direct examination. Trial counsel planned to attack Dr. TR's assessment on cross-examination using their own 29-slide demonstrative aid. This aid primarily consisted of excerpts from various journals along with the scoring rubric for the Violence Risk Appraisal Guide and other assessment tools plus a list of ten "risk factors" pertaining to Appellant. Trial counsel averred that "every single one of these articles is taken from the sources that were cited in Dr. TR's report." The slides with the excerpts generally contained large passages from articles with small excerpts highlighted and called out to the left of the larger passages. For example, one slide contained an entire two-column page from a study with one 18-word sentence called out.

Outside the presence of the members, trial defense counsel objected to the slides, asserting that the Government was attempting to show the members information that had not been admitted into evidence. The Defense further specifically objected to one slide ("Slide 28") that contained an excerpt from an article suggesting that a comparison between misconduct by prisoners on death row and those not on death row was inapt due to the difference in the confinement conditions of those two populations.[32] The Defense's objection to

---

[32] The article was among those listed in the version of Dr. TR's report which contained citations to the studies and articles he had relied upon.

Slide 28 was based on the premise that trial counsel was simply trying to telegraph to the members that Appellant had been previously sentenced to death, a fact which had not otherwise been disclosed to them.

After hearing the parties' arguments, the military judge had Dr. TR review trial counsel's slides and then asked him whether they contained the type of data he or other experts would rely upon in "in reaching the type of conclusions that [he] did" in Appellant's case. Dr. TR answered, "Generally speaking, that's true, Your Honor." The military judge overruled the Defense's objection, saying, "I don't find that the [G]overnment intends to use this for an improper purpose of announcing or presenting evidence of the prior sentence in this case. But instead, is presenting this information just to put in context the data that was provided by Dr. [TR] during his direct examination."

In the Government's cross-examination of Dr. TR, trial counsel asked him about various studies, some of which Dr. TR had co-authored. These studies identified different factors correlated to prison misconduct which Dr. TR either had not discussed or had found to be inapplicable to Appellant's situation. For example, some of the studies focused on the age of the prisoner at the time of the prisoner's conviction as opposed to the time of assessment. Dr. TR agreed with trial counsel in some respects and disagreed in others, often asserting that some of the studies cited by trial counsel had never been replicated or validated with respect to prison populations. A particular point of contention was that trial counsel often pointed to studies of assessment tools geared towards information known at the time an accused is being initially sentenced, while Dr. TR was assessing a person who had been in confinement for more than 12 years. In some cases, Dr. TR said he was unfamiliar with particular studies trial counsel asked him about, yet trial counsel showed excerpts from those studies and proceeded to ask Dr. TR questions about those studies without objection by the Defense.

Trial counsel sought to demonstrate that Appellant's risk of future dangerousness was higher than Dr. TR concluded it was by pointing to the scores Appellant would have received had Dr. TR used other assessment tools, such as the Violence Risk Appraisal Guide.[33] Dr. TR said he was aware of the tools, but explained he had not used them because he was not confident in their applicability to Appellant's case. Some of trial counsel's slides depicted scoring sheets from these tools with hypothetical values assigned to Appellant—from

---

[33] The Violence Risk Appraisal Guide assigns points to the person being assessed based upon a variety of criteria, ranging from whether the person lived with both biological parents through the age of 16 or had ever been married, to whether the person met the criteria for personality disorders.

which trial counsel argued Appellant was a higher risk than Dr. TR found him to be.

Regarding Slide 28, trial counsel said to Dr. TR, "you talk a lot about how capital offenders are not a disproportionate risk to offend in prison," and then he read the following quote from a larger excerpt displayed on the slide: "data from death sentence inmates are not directly comparable because those condemned inmates are held under super maximum conditions that are distinctly different from those that these inmates would have encountered had they been sentenced to capital life terms and placed in the general prison population." Trial counsel then pointed to Appellant's clean disciplinary record and asked, "Isn't it also correct that this same analysis regarding the type of maximum conditions apply to the accused in this case because he was held under maximum security conditions for the vast majority of his confinement at the Disciplinary Barracks[?]" Dr. TR answered, "Yes," and trial counsel moved on to other matters. On redirect, the Defense did not ask Dr. TR anything about this particular study or the context of the excerpted language quoted by trial counsel and included on Slide 28.

In the Government's sentencing argument, trial counsel used another slide presentation. Five of the slides in that presentation were duplicates of slides trial counsel used during Dr. TR's cross-examination. The Defense objected to these five slides prior to trial counsel's argument, four of which depicted the scoring system for a risk assessment tool Dr. TR did not use. The military judge overruled the objection, stating "they reflect his testimony and things that he testified about." Trial counsel proceeded to argue at length that the members should rely upon the score Appellant would have received had Dr. TR used the other risk assessment tool. Trial defense counsel did not specifically request a limiting instruction regarding the slides trial counsel used during Dr. TR's cross-examination and sentencing argument, and the military judge did not *sua sponte* give one.

**2. Law**

Under Mil. R. Evid. 702, expert witnesses "may testify in the form of an opinion or otherwise." In doing so, expert witnesses may base their opinions on facts or data reasonably relied upon by experts in the particular field, even if such facts or data are not otherwise admissible. Mil. R. Evid. 703. Subject to the military judge's weighing of the probative value and the prejudicial impact of otherwise inadmissible matters, a party may cross-examine an expert witness regarding such matters in order to help members evaluate the witness's opinion. Mil. R. Evid. 703 and 705.

Although trial counsel's slides were not admitted into evidence, we utilize the abuse of discretion standard in reviewing the military judge's decision to

permit trial counsel to use the slides as a demonstrative aid. *See, e.g.*, *United States v. Stark*, 24 M.J. 381, 385 n.2 (C.M.A. 1987) ("The decision to permit or deny the use of demonstrative evidence has generally been left to the sound discretion of the trial judge."); *Lowe v. State*, 259 So. 3d 23, 39 (Fla. 2018); *Sheffield v. United States*, 111 A.3d 611, 625 (D.C. 2014); *United States v. Palazzo*, 372 Fed. Appx. 445, 452 (5th Cir. 2010) (unpub. op.) (per curiam).

### 3. Analysis

Appellant contends the military judge erred in permitting the Government to display excerpts from articles during Dr. TR's cross-examination which were not admitted in evidence. The vast majority of the articles referenced on trial counsel's slides were included in the list of articles Dr. TR indicated he had relied upon—a list which had been provided by the Defense to the Government.[34] Thus, the Defense can hardly claim surprise. In addition, after being given the opportunity to review the slides trial counsel planned to use, Dr. TR said that "[g]enerally speaking," it was true that the slides contained the sort of data that either he relied upon or experts in his field would rely upon.

To the extent Appellant argues trial counsel should not have been permitted to cross-examine Dr. TR by asking him about studies not admitted into evidence, we disagree. It is within the military judge's discretion to permit trial counsel to test the opinion of an expert witness with not just un-admitted matters, but with matters which are inadmissible in their own right. *See, e.g.*, *United States v. Jackson*, 38 M.J. 106, 110 (C.M.A. 1993). Thus, trial counsel was permitted to ask Dr. TR about other studies and assessment tools in order to test the basis for his opinion. Our superior court has cautioned that military judges "should give a limiting instruction" when otherwise inadmissible information is used to cross-examine an expert to limit the likelihood that members will treat the information as evidence. *United States v. Neeley*, 25 M.J. 105, 107 (C.M.A. 1987). When, however, an expert is asked about otherwise admissible information—such as matters contained in a learned treatise—that information is available for the factfinder to use for the truth of the matter asserted. Mil. R. Evid. 803(18); *Jackson*, 38 M.J. at 110 (footnote and citation omitted).

Ostensibly, the members could have considered the matters trial counsel questioned Dr. TR about as evidence, assuming trial counsel adequately laid a basis for their admissibility. *See, e.g.*, *United States v. Coleman*, 41 M.J. 46, 49 (C.M.A. 1994) (discussing foundational requirements for cross-examining witness on matters in learned treatise). But trial defense counsel's objection did

---

[34] Based upon our review of the record, we have determined trial counsel's slides included portions of at least two studies which Dr. TR had not included in his list of articles.

not go to whether the members could not treat the matters as evidence—instead, the Defense's objection was that the matters should not be visually broadcast to the members via trial counsel's slides. Notably, trial defense counsel never objected to the Government asking the questions they did, nor did trial defense counsel ask the military judge to preclude the Government from asking questions about the articles and assessment tools. Considering that trial counsel could read out loud a section of a relevant article to an expert witness and ask the witness if he or she was aware of it, agreed with it, or considered it, we are unclear—and Appellant has not explained—why it would not be within a military judge's sound discretion to permit counsel to post the text of such a section on a slide and then display that to the members as part of counsel's cross-examination.

The instant case is more complicated, however, because the cross-examination slides did not simply include the portions of the articles quoted in trial counsel's questions. Instead, they included large portions of the articles with the quoted material highlighted. In other words, trial counsel's slides included a substantial amount of information never posed to Dr. TR (or any other witness) or read to the members. The purpose behind including such unreferenced information in the slides is not clear to us. The military judge's basis for permitting trial counsel to broadcast this extraneous information to the members is equally elusive. We cannot tell if the military judge permitted Slide 28 to be used because he believed the Government had adequately laid the foundation for its admissibility, whether under a hearsay exception or otherwise. Similarly, we are unable to discern whether he concluded it was an inadmissible matter Dr. TR had based his opinion on—but that its probative value substantially outweighed its prejudicial effect under Mil. R. Evid. 703.[35] All the military judge said about Slide 28 was that he believed it "put in context the data that was provided by [Dr. TR] during his direct examination." Other than saying he was overruling the Defense's objection, the military judge said nothing at all about the extraneous verbiage on the other slides. We note that at the time the military judge ruled, he did not know what trial counsel specifically intended to ask Dr. TR when the slides were displayed; however, it was highly unlikely trial counsel intended to read the entirety of the slides to Dr. TR, given the volume of information printed on them.

We are not convinced the military judge did not abuse his discretion with respect to the extraneous information on the slides. Although Dr. TR's comment that the information in the slides was "generally speaking" the sort experts in his field relied upon was hardly an authoritative endorsement, Dr.

---

[35] To the degree the military judge so balanced the probative value of Slide 28, he made no reference to his analysis on the record.

TR's testimony indicated he was aware of most of the studies and had opinions as to their applicability to Appellant's case. Moreover, Dr. TR had personally authored or co-authored many of the studies and he was able to cogently discuss the studies he said he was unfamiliar with, so the information was likely admissible under the learned treatise hearsay exception. Even if inadmissible under that rule, the information would have still been available to test the basis of Dr. TR's opinion, even though the military judge never specifically instructed the members as to that limitation. Arguably, the fact trial counsel elected to place the information on a visible slide rather than simply read it to the witness is a distinction without a difference, because the information would be in front of the members in either case, had trial counsel questioned Dr. TR about it. The problem with this analysis, however, is that trial counsel never asked Dr. TR about the extraneous information on the slides, and Dr. TR did not testify about any of it. Instead, the material was simply displayed to the court members without instruction or context, leaving the members free to read the information and incorporate it into their analysis of the case as they saw fit.

In general, a demonstrative aid "illustrates or clarifies the testimony of a witness." *United States v. Heatherly*, 21 M.J. 113, 115 n.2 (C.M.A. 1985). We are unable to determine how unquestioned-about and untestified-to text from unadmitted documents accomplished either of those functions during Dr. TR's cross-examination. We conclude the military judge abused his discretion in permitting this information to be displayed to the members without at least providing an instruction to the members on its permissible use.

Despite concluding the military judge abused his discretion with respect to the extraneous information on the slides, we conclude Appellant was not materially prejudiced based upon our review of the record.

We first note that the matters on trial counsel's slides did not substantively impact the effectiveness of the cross-examination one way or the other. Trial counsel effectively demonstrated the arguable shortcomings in Dr. TR's analysis as well as the fact that different assessment tools might lead to different conclusions. Trial counsel made these points during the verbal cross-examination, and the slides—at most—served to drive those points home. With respect to the extraneous information on the slides, Appellant has not indicated, nor have we been able to identify, any specific language contained therein which might have had an impact on his case.

The nature of Dr. TR's testimony also leads us to conclude Appellant was not prejudiced. Through Dr. TR's testimony, the Defense sought to portray Appellant as being unlikely to engage in any violent conduct while in confinement. The Government, on the other hand, sought to undermine this portrayal, suggesting to the members that Appellant did pose a risk in confinement. The

framing of this debate, however, was not that Appellant did or did not pose a risk to the outside community or that he was more or less likely to commit other crimes upon release from confinement, but rather, whether he would be violent *in prison*. Whether Appellant would pose some sort of elevated risk to the *outside community*, should he be released, was never part of Dr. TR's testimony. As Dr. TR explained, the Defense asked him to analyze Appellant's risk should he receive a sentence of life *without* the possibility of parole. Somewhat in line with this framing, neither party made any significant effort to argue Appellant should or should not be sentenced to life *with* the possibility of parole; instead, the central theme of the rehearing was whether or not Appellant should be sentenced to death.

The logical importance of Appellant's dangerousness in confinement bears on the question of whether or not Appellant would pose a threat to other inmates and the confinement facility's staff. If he did pose such a threat, one could argue Appellant should be executed in order to permanently eliminate that threat. Indeed, during the Government's sentencing argument, as discussed in greater detail in Section II(H), *infra*, of this opinion, trial counsel attempted to persuade the members to sentence Appellant to death rather than accept the risk that Appellant might harm prison staff. The inverse of this proposition would also be true: if Appellant did not pose a risk of danger to his fellow inmates or the prison staff, then Appellant was suited for a lengthy, even life-long, term of confinement. Beyond this construct, Appellant's likelihood of presenting a future danger while in confinement was of negligible relevance, especially given the limited sentencing options in his case. Appellant sought to demonstrate that he was a model prisoner who could quietly spend the rest of his life in a confinement facility, and there was therefore no reason to shorten his life out of concern for the safety of the prison staff or other inmates. The Government, meanwhile, sought to undermine that premise in order to support the argument that Appellant should be executed, effectively reducing the period of time he remained in prison.

The members sentenced Appellant to life without the possibility of parole, a sentence which necessarily contemplates spending as much time in confinement as possible. That is, whatever weight the members gave to trial counsel's attempt to portray Appellant as posing a risk of danger in confinement, they apparently did not find that portrayal so compelling as to warrant the death sentence.

Once the members decided not to sentence Appellant to death, the only decision for them to make regarding his confinement was whether it would be with or without eligibility for parole. The relevance of Appellant's future in-prison dangerousness to this question approaches non-existence; a sentence

that allows for parole and thus less time in prison has no obvious logical connection to a determination that the prisoner has a higher or lower risk of prison misconduct.[36] Thus, we conclude that whatever can be said of Dr. TR's opinion on Appellant's risk of future dangerousness, the likelihood it impacted the members' decision on whether to grant Appellant the possibility of parole was negligible. Similarly, to the extent trial counsel was able to capitalize on any error regarding the display of the slides, we see no convincing argument that this led to a different sentence. Thus, even though we find error regarding trial counsel's slides, Appellant was not prejudiced.

## F. Appellant's Updated Risk Assessment

Appellant contends the military judge erred in permitting trial counsel to demonstrate that an assessment produced by prison officials had not been properly prepared when Dr. TR—unaware of the assessment's shortcomings—relied upon it in preparing for his testimony.[37] Appellant also argues the military judge erred when he denied the Defense's request to withdraw the assessment from evidence. We conclude the military judge did not err.

### 1. Additional Background

Early in the Defense's case, just after the Government rested on 18 June 2018, trial defense counsel sought to admit several documentary exhibits into evidence. Once the military judge agreed to relax the rules of evidence, trial counsel indicated they had no objections, and the exhibits were admitted. One of the exhibits, Defense Exhibit 7, included a document titled "Updated Risk Assessment." The assessment was dated 1 May 2018 and signed by Ms. AD, who had taken over as Appellant's prison counselor after Mr. JL retired. The assessment concluded Appellant's "internal risk" at the time was "low," as he had "proven to be compliant and cooperative" and had not exhibited any traits suggesting he would be a dangerous threat to other inmates or prison staff. The assessment further noted Appellant's custody level had been upgraded to "Minimum Inside Only."

On 19 June 2018, after several witnesses testified, the military judge instructed the members—pursuant to a defense request—to spend the rest of the day reviewing Defense Exhibit 7 along with two other exhibits, and the court recessed at 1448 hours. When the court reconvened the morning of 20 June

---

[36] Conceptually, one might conclude a person's likelihood of in-prison misconduct correlates to his or her likelihood of committing misconduct once released from prison, but no witness testified on this point and neither party argued it.

[37] See Appendix, AOE VII.

2018, the military judge asked the members if they had been able to read through the exhibits, and they said they had. Dr. TR was then called to testify.

Dr. TR did not mention Ms. AD or her assessment during his testimony on direct, but one of the slides used during that testimony was titled "Institutional Appraisals" and referenced Ms. AD. The slide contained three main headings—one each for the Disciplinary Barracks' deputy commandant, Appellant's counselors, and the education supervisor. The second heading is relevant here, as it identified Mr. JL and Ms. AD as licensed clinical social workers. Beneath that heading, the first bullet read, "Average risk assessment 2016—[Mr. JL]," while the second read, "Provide monthly therapy sessions."

Midway through Dr. TR's cross-examination, early in the afternoon of 20 June 2018, trial counsel asked Dr. TR about Ms. AD's assessment, drawing an objection by trial defense counsel who argued the assessment had not been mentioned in Dr. TR's report or his testimony. Trial counsel pointed out that Ms. AD was referenced on the one slide and, moreover, that her assessment was a defense exhibit. The military judge overruled the objection, at which point the Defense requested an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing outside the presence of the members.

During that hearing, the Defense produced an email showing that one of the trial counsel had contacted the Disciplinary Barracks' deputy staff judge advocate on 8 June 2018. In the email, the trial counsel asserted the Defense had just provided notice of their intent to introduce Ms. AD's risk assessment, and that trial counsel would need Ms. AD's notes and related documents. Ten days later, in the evening of 18 June 2018—the day before the members were told to review Defense Exhibit 7—the deputy staff judge advocate responded to the email with a short message stating that the risk assessment was "unauthorized and invalid," that he needed to talk to trial counsel at his earliest convenience, and that "[t]his is going to get ugly." The one trial counsel that the deputy staff judge advocate emailed, however, had been temporarily excused from the proceedings due to a medical emergency, and he was not released from the hospital until around noon on 19 June 2018. At some point after being released, this trial counsel saw the email and forwarded it to trial defense counsel at 1514 hours on 19 June 2018 without any discussion about the assessment, simply noting, "see below." Thus, this email had been sent about 30 minutes after the military judge told the members to start reviewing the defense exhibits.

In discussing their objection, trial defense counsel characterized Ms. AD's risk assessment as having not been "validated." The military judge asked what that meant, and trial defense counsel answered they were not sure, saying, "[W]e were just told by the [G]overnment something was wrong with the report. We found out yesterday after the conclusion of court. And we haven't had

the opportunity to sort of figure out what's going on with that report." The military judge turned to Dr. TR and asked if he had relied on Ms. AD's assessment in reaching his conclusions. Dr. TR said that although he received it after he wrote his own report, he intended to include it in his "presentation," but that he heard for the first time on the day before—19 June 2018—that "there's some problem with it." Dr. TR maintained his conclusions would be no different even if he had not considered the assessment. Trial counsel then told the military judge that Ms. AD's assessment had not been properly coordinated and that Ms. AD did not have a reason to prepare the assessment in the first place.

Trial defense counsel said they believed it was "appropriate" for trial counsel to "attack the validity of the report," because "[i]t is evidence," but they contended Dr. TR was not the appropriate witness to question about the assessment's validity because he lacked any knowledge on that point. The military judge said he would allow trial counsel to ask Dr. TR the limited questions of: (1) whether he relied on the assessment, and (2) whether he was aware it was not issued in accordance with Disciplinary Barracks policies and procedures. The Defense argued trial counsel should only be allowed to ask the first question, because Dr. TR had just explained the assessment did not change his opinion. The military judge responded that the Defense would "get a chance to do redirect," and he allowed trial counsel to ask both questions.

When cross-examination resumed, Dr. TR said he had reviewed Ms. AD's assessment and relied on it in his preparation for his testimony, but that he only became aware that it had not been issued in accordance with Disciplinary Barracks' policies and procedures moments earlier. Trial defense counsel did not ask Dr. TR anything about Ms. AD's assessment during redirect examination.

One week later, on 27 June 2018, trial defense counsel asked to withdraw Defense Exhibit 7. Trial defense counsel asserted that, over the preceding week, they had determined the assessment had not, in fact, been appropriately routed for approval, and that if they had known that earlier, they never would have sought admission of the exhibit. Trial counsel opposed the Defense's request, and the military judge denied it, because the exhibit had already been admitted into evidence, referred to in Dr. TR's cross-examination, and considered by the members.

The following week, during the Government's case in rebuttal, trial counsel called Mr. WG, the Disciplinary Barracks' new assessment chief, the position Mr. JL had once filled.[38] Mr. WG testified that Appellant had not been due for a risk assessment in May 2018, and that Ms. AD had told him she updated the

---

[38] Mr. WG started in this position in February 2018.

risk assessment because Appellant was being resentenced, which would ordinarily not be a reason for a reassessment. On cross-examination, Mr. WG admitted that risk assessments can be prepared to meet administrative needs, and the fact Appellant's custody level had been upgraded in 2017 "very well could" be such an administrative need that would call for a new risk assessment. Trial defense counsel asked whether, in light of Mr. JL's retirement, Appellant had a counselor at the time of the change in Appellant's custody level. Mr. WG, however, said he did not know whether Appellant had a counselor then, when Ms. AD took over as Appellant's counselor, or whether an updated risk assessment had been completed when Appellant's custody level was changed. Mr. WG admitted he had not checked to see if an updated risk assessment was prepared in 2017.

Trial counsel engaged in a colloquy with Mr. WG about prisoners manipulating prison staff members before asking if the risk assessment had been given directly to Appellant. Mr. WG initially said it had been, but when asked a non-leading follow-up question, Mr. WG said he had been told the assessment had been given to the defense team. During cross-examination, Mr. WG conceded the assessment had only been provided to Appellant's counsel and that he had never been told the assessment was given to Appellant himself. Mr. WG further admitted he had no knowledge of Appellant trying to manipulate Ms. AD into creating the assessment in the first place. Ms. AD was not called to testify by either party.

During the Government's sentencing argument, trial counsel did not refer to Ms. AD's risk assessment or Dr. TR's reliance on it.

### 2. Law

The scope of and limits on cross-examination are within a military judge's discretion. *See, e.g.*, *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017). We review a military judge's decision to admit evidence which is adduced through cross-examination for an abuse of discretion. *See United States v. Piren*, 74 M.J. 24, 27 (C.A.A.F. 2015).

### 3. Analysis

Appellant's argument is essentially that he should have been able to have confidence in the validity of the updated risk assessment by virtue of the fact it was given to the Defense by Ms. AD, a government employee. By extension, Appellant argues the military judge should have both precluded trial counsel from cross-examining Dr. TR about the assessment and allowed the Defense to withdraw the exhibit once that validity was called into question. Had the military judge done so, Appellant contends the Government would not have not been permitted to elicit Mr. WG's rebuttal testimony on the matter. The crux

of Appellant's argument is that the Government (via Ms. AD) misled the Defense by providing them with an unapproved assessment—an assessment which the Defense subsequently relied on in their case.

Appellant would have us analogize this situation to government agents intentionally withholding or mischaracterizing the nature of exculpatory evidence. Based upon the record before us, however, we find this analogy inapt because there is no indication Ms. AD had any inkling there was anything amiss with her assessment. Moreover, the Defense obtained the assessment directly from Ms. AD, outside the normal discovery procedures, thereby depriving trial counsel the ability to ascertain the legitimacy of the document before turning it over to the Defense. From the record, it appears trial counsel first learned the assessment existed at all on the Friday before the parties gave their opening statements that Monday. Considering the manner in which the Defense obtained the assessment and the compressed timeline the parties were operating under, trial defense counsel were best-positioned to investigate the legitimacy of the document in their possession before offering it as an exhibit if they wanted to be certain it was valid.

We recognize Ms. AD was a government employee. At the same time, the notion that government employees might make administrative errors is hardly far-fetched. Given the stakes of the case, and considering the manner in which trial defense counsel obtained the assessment prior to offering it into evidence, we would have expected the Defense to seek confirmation of the assessment's legitimacy. That being said, we also would have expected the Government to have investigated and revealed the infirmities of the assessment much sooner than it did, especially in a case wherein the Government was seeking the death penalty. Nonetheless, other than demonstrating an arguable error on Ms. AD's part and apparent delay on the Government's part in discovering and disclosing that error, the Defense has not shown any conduct rising to the level of prosecutorial misconduct. We also see no basis for concluding the military judge abused his discretion in not taking the extraordinary measure of withdrawing an admitted exhibit days after the members had been told to review it. Similarly, we find no error in the military judge permitting the Government to ask Dr. TR whether he relied on the assessment and whether he knew its validity had been questioned. This, of course, is a standard practice with expert witnesses. *See* Mil. R. Evid. 705.

Even if we were to find error on the military judge's part, which we do not, we fail to see how Appellant suffered any prejudice. Defense Exhibit 7 was extremely favorable to Appellant, essentially portraying him as a model prisoner with little risk of committing jailhouse misconduct. While the Government sought to show the assessment was invalid and that Appellant had nefariously procured it, trial defense counsel undercut both lines of attack to the

point that all that could be said of the assessment's origins was that it did not go through the ordinary staffing process. Despite the controversy about the creation of the assessment, the Government never established there was anything incorrect in the assessment itself or that Ms. AD had disavowed her conclusions in any way. The members were never told they could not rely on the assessment and neither party argued they could not do so. Thus, Appellant was in a better position by virtue of the assessment being admitted than he would have been had the Defense's request—which sought to remove the assessment and all references to it from the rehearing—been granted. The assessment also bolstered Dr. TR's testimony, even though trial defense counsel failed to elicit the fact his opinion would have remained the same without it. Based on the Government establishing, at most, an administrative anomaly with respect to the assessment, we conclude its admission—along with Mr. WG's rebuttal testimony—did not operate to prejudice Appellant, and he is entitled to no relief.

## G. Cross-Examination of Defense Forensic Psychiatrist

Appellant argues on appeal that the military judge erred by permitting trial counsel to ask a defense expert witness about a document found on Appellant's computer, despite the fact trial defense counsel never objected to the line of questioning.[39]

### 1. Additional Background

The Defense called Colonel (Col) SM, an Army forensic psychiatrist, who testified he had diagnosed Appellant with four disorders. In forming his diagnoses, Col SM interviewed Appellant and reviewed such items as the transcript of Appellant's original court-martial, his medical records, recordings of his phone calls from the Disciplinary Barracks, and notes from interviews with other mental health professionals.

One of Col SM's diagnoses pertained to a traumatic brain injury he concluded Appellant had sustained in a motorcycle accident, which happened in late February 2004, approximately four months before his crimes. At the time, Appellant had been dating another Airman, MM. Col SM explained that MM found Appellant to be "a completely different person after the motorcycle accident," as he became more aggressive, disrespectful and verbally abusive, and she broke off the relationship with him in March or April of 2004 as a result. Col SM compared MM's assessment with others' impressions from before the accident which described Appellant as caring, sweet, and "never aggressive." Col SM said a declaration written by MM was "one of the best examples" of the purported change in Appellant's behavior, because MM was in a months-long

---

[39] See Appendix, *Grostefon* issue XXII.

intimate relationship with Appellant at the time. Col SM also testified that he had not seen any evidence that Appellant had been "abusive or nasty to anybody else" prior to the accident.

Although it is not entirely clear from the record how it was obtained, the Government possessed a word processing document found on a computer owned or used by Appellant. The document seemed to have been created prior to the motorcycle accident, and it appeared to be a letter to MM in which Appellant catalogued his sexual "grievances" with her. The document, which trial counsel referred to as "the break-up letter," discussed Appellant's frustrations with his relationship with MM, couching some of those frustrations in misogynistic and demeaning, but not aggressive, terms. There was no evidence the document had ever been sent to MM or anyone else.

During the Government's cross-examination of Col SM, trial counsel read seven passages from the document and asked whether each was "correct" after reading them one-by-one. Col SM answered "yes" to each, and the Defense never objected during the exchange. Trial counsel later asked Col SM whether it was possible that Appellant's post-accident behavior, as described by MM, was due not to a motorcycle accident but was the product of Appellant simply being a misogynist. After Col SM agreed that was a possibility, trial counsel asked whether it was true that Ms. JS's wounds were more severe than SrA AS's and SrA JK's. Trial defense counsel objected and the military judge sent the members to lunch and convened an Article 39(a), UCMJ, session. After resolving the Defense's objection regarding the wound question, the military judge told the parties that when the members returned, he intended to give the members "a better instruction about 'have you heard/did you know'-type questions."

Just before the members were called back in, the military judge provided his draft instruction to the parties, and the Defense indicated they had no objection to it. The military judge then told the members the following before the Government was permitted to continue its cross-examination of Col SM:

> When a witness testifies about his or her opinion, it is permissible to ask that witness, during cross-examination, whether he or she knew, had heard, or was aware of certain matters beyond those matters to which the witness testified on direct examination. Such a question is permitted to test the basis of the witness's opinion and to enable you to assess the weight you accord his or her testimony. You may consider the question for this purpose.

> If the witness admits knowledge of the matter, then you may also consider the question and answer to rebut the opinion given.

> You may not, however, infer from this evidence that the accused is a bad person or has criminal tendencies. The question may only be considered for the limited purpose I stated.

Trial defense counsel did not ask about MM or the document in the Defense's re-direct examination of Col SM. Later in the rehearing, during the Government's rebuttal case, trial counsel sought to admit the document as substantive evidence in support of a theory that Appellant targeted Ms. JS based upon her gender. The Defense opposed admission of the document, and the military judge denied the Government's request, explaining that while the contents of the letter may have been relevant to Col SM's formulation of his opinion, they did not have any independent relevance. In the instructions he later gave to the members, the military judge repeated the above instruction about "have you heard" questions.

Trial counsel only briefly referred to the document during the Government's sentencing argument when he said:

> You heard the cross-examination of [Col SM] about "Hey, did you consider this letter he wrote?" "Yes, I did." "Did you consider the fact that he wrote this letter before the motorcycle accident?" "Yes, I did." "Is that really a change of behavior?" "Oh yeah, I think so." You can consider that. As the judge instructed you, you can consider what he—what that letter was and when it was written in evaluating [Col SM's] testimony.

### 2. Law and Analysis

Had trial defense counsel objected to the questions posed to Col SM by trial counsel, we would review the military judge's decision to permit them for an abuse of discretion. Because there was no such objection, the matter is forfeited, and we review for plain error, which we do not find here.

As an expert witness who offered his professional opinion, Col SM was subject to being asked about not only the information he relied upon in forming his opinion, but also about additional information which—if true—might impact his opinion. Mil. R. Evid. 703, 705. Military judges are advised to provide limiting instructions explaining how the members may consider such questions, as the military judge did here. *See, e.g.*, *Neeley*, 25 M.J. at 107. During direct examination, Col SM's testimony characterized Appellant's pre-accident demeanor as caring, sweet, and unaggressive. The caustic tone of Appellant's computer document seemed counter to this characterization and trial counsel fairly used it to test, if not undermine, Col SM's opinion—especially considering Col SM testified he was already aware of the document's contents. Although there was no evidence Appellant actually sent the document to anyone,

we conclude the document's contents carried some relevance to Col SM's overall opinion. Apparently perceiving the inflammatory nature of the questions that trial counsel asked Col SM about the document, the military judge *sua sponte* gave a limiting instruction to the members in the middle of trial counsel's cross-examination—an instruction which he repeated before the members began their deliberations. Trial counsel's later sentencing argument on the matter was consistent with that instruction, and we identify no error on this issue, plain or otherwise.

## H. Trial Counsel's Sentencing Argument

On appeal, Appellant launches a multi-faceted attack on the Government's sentencing argument, asserting trial counsel committed prosecutorial misconduct in several aspects. Specifically, he claims trial counsel improperly used personal pronouns, offered personal views on the evidence, maligned defense counsel, maligned defense theories, and inflamed the passions of the members by making various comments described in greater detail below.[40]

### 1. Additional Background

The senior trial counsel on Appellant's case gave the Government's sentencing argument which lasted a little over two hours. He also gave a very brief rebuttal to the defense argument. His approach to the argument was to repeatedly ask the members what they "stand for" and where they would "draw the line." Indeed, in his opening lines to the members, he said,

> [W]hen you go back into the deliberation room and you're deciding on what your sentence will be, I want to [sic] ask yourselves what will you stand for. From E-6 to O-6, as an individual, what will you stand for as an individual, as an Airman? Where will you draw the line?

By the time trial counsel concluded his argument, he had asked the members what they would stand for and where they would draw the line nearly 30 times each. In addition, trial counsel repeatedly asked the members "what risk" they would "allow" in addition to asking them what they would "allow to exist." The following excerpt is an example:

> When you're deliberating on a sentence—and make no mistake, the [G]overnment is asking you for a sentence of death—ask yourself, "Where will I draw the line? What will I stand for?" What will you stand for? Base housing. Took one of our own. Committed in uniform. What will you allow? What will you stand for in the future?

---

[40] See Appendix, AOE X.

Trial counsel characterized the members' sentencing decision in terms of the members accepting risk on others' behalf multiple times. For example, when discussing evidence of Appellant's potential for future prison misconduct, he asked the members, "What risk will you accept on some confinement officer's behalf? What risk?" He later asked, "What risk will you accept on another family's behalf? On a correction officer's behalf?" In the 256 slides trial counsel displayed during his closing argument, the next to last slide read: "What risk will your sentence accept on someone else's behalf?"

Although trial counsel's argument did discuss the specifics of the offenses in the case, his presentation was heavily focused on his entreaty to the members to send a message about what they would personally stand for both regarding Appellant's case and in the future. For example, trial counsel asked the members several times if they did not adjudge the death sentence in Appellant's case, "where would you ever?" Building on this theme, trial counsel suggested if the members did not sentence Appellant to death, "we'll never draw [the line] ever, ever." After describing Appellant's crimes, trial counsel asked, "What will you stand for? Will you stand for this when you're deciding on your sentence? Will you stand for this? Will you allow it, or will you draw a line as an individual, as an Airman? Will you draw a line?" Near the end of his argument, trial counsel asked the members, "Where will you stand for with your sentence? . . . If not here, where? If not in this case, when would you ever? When would you ever?"

Trial counsel described the members' obligations in notably personal terms, such as when he asked the members, "From E-6 to O-6, where else in your career will you have the opportunity to draw the line as an individual, and as an Airman on what you will allow?" Trial counsel further told the members their sentence will tell the victims' families "where you stand as an individual . . . where you stand as an Airman."

The Defense only objected twice during the argument, both times near the very end of trial counsel's argument. The first objection, which was overruled, was on a point which the Defense argued amounted to a comparison of Appellant to one of his victims. The second objection—also overruled by the military judge—came when trial counsel implied Appellant posed a risk to others; the Defense's argument was that there was no evidence of future dangerousness.[41]

Trial defense counsel opened the Defense's argument with the following:

---

[41] By the point of the Defense's objection, trial counsel had already repeatedly suggested Appellant posed a danger to others and asked the members if they were willing to accept that risk.

> In this case, and in any case any jury ever sits on in a death penalty case, their job is not to draw a line. Their job is not to say what we do and don't stand for. Their job is to make an individual moral decision based on the facts before them, and not just the facts of the crime, but all the facts in the case. That is your job. That is the job of this panel. Not to draw a line, not to stand for something. The law has already said we don't stand for murder. No one in this room will ever say we stand for murder. The law drew a line when it convicted him 14 years ago and said that this is absolutely wrong. It held him accountable, it held him responsible when he was convicted.

In the Government's short rebuttal, trial counsel again told the members their sentence "will send a message about you as an individual, and what you as an Airman will accept. It will—it will tell everyone where you draw the line, and what you will stand for." He concluded, "Anything less than the death penalty is a message you cannot send. What will you stand for?"

The military judge instructed the members about their individual discretion regarding sentencing Appellant to death:

> Members, even if you have found, in accordance with the instructions I have given you, that an aggravating factor exists, and that the extenuating and mitigating circumstances are substantially outweighed by the aggravating circumstances, each member still has the absolute discretion to not vote for a death sentence. Even if death is a possible sentence, the decision to vote for death is each member's individual decision.

During other parts of the Government's argument, trial counsel arguably denigrated certain aspects of the Defense's case. For example, when dismissing any correlation between Appellant's mental health and his family history of mental health issues, trial counsel argued, "This is hokum," and, "The family history means nothing." At another point, trial counsel sought to undermine the Defense's evidence suggesting Appellant might have suffered from mental illness or a brain injury by telling the members, "Obviously—I mean, if you couldn't tell it then. This is ridiculous." When discussing Dr. TR's opinion that Appellant did not pose a significant risk of committing prison misconduct, trial counsel told the members, "Base rates, base rates—nobody cares about base rates."[42] Without specifically accusing trial defense counsel of misconduct, trial

---

[42] Dr. TR had explained predicting prison misconduct was difficult because serious prison misconduct is rare, despite how prison life is typically portrayed in popular media; thus, the "base rate" of serious prison misconduct is very low.

counsel implied the Defense had been deceitful in their opening statement and in presenting evidence. Trial counsel did so by asking the members, "Why these misrepresentations? . . . Why misrepresent that? . . . . Why do that?" Trial counsel later described trial defense counsel's characterization of the evidence surrounding the number of phone calls to Appellant the night of the murders as "a blatant mischaracterization. Blatant." In addition, five of trial counsel's slides carried the title, "Misrepresentations and Trivialities."

Based upon Appellant's offenses, the members were required to sentence Appellant to at least life in prison, but they could qualify that prison term as being either with or without eligibility for parole. They also had the option of sentencing Appellant to death. Trial counsel argued the only appropriate sentence was the death penalty, while the Defense—without taking any particular stance on the possibility of parole—asked the members to sentence Appellant to confinement for life. After deliberating for about seven and a half hours, the members sentenced Appellant to life without eligibility for parole. When the court-martial president announced the sentence, he said it was with "all of the members concurring."[43]

### 2. Law

We review claims of prosecutorial misconduct and improper argument de novo; when no objection is made at trial, the error is forfeited, and we review for plain error. *Voorhees*, 79 M.J. at 9 (citation omitted).

In presenting argument, trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted). Trial counsel "may strike hard blows, [but] he is not at liberty to strike foul ones." *Berger*, 295 U.S. at 88. Trial counsel commits error by making arguments that "unduly inflame the passions or prejudices of the court members." *United States v. Marsh*, 70 M.J. 101, 106 (C.A.A.F. 2011) (internal quotation marks, alterations, and citation omitted). With respect to sentencing arguments, we must be confident an appellant "was sentenced on the basis of the evidence alone." *United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014) (quoting *United States v. Halpin*, 71 M.J. 477, 480 (C.A.A.F. 2013)). Impermissible vouching "occurs when the trial counsel 'plac[es] the prestige of the government behind a witness through personal assurances of the witness's veracity.'" *Fletcher*, 62 M.J. at 180 (quoting *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir.

---

[43] On the sentencing worksheet the members used, the president crossed out the language "at least three-fourths" so that the relevant sentence read, "all of the members concurring" as opposed to the alternative, "at least three-fourths of the members concurring."

1993)). In assessing the impact of improper sentencing argument on an appellant's substantial rights in the absence of an objection, we ask whether the outcome would have been different without the error. *United States v. Norwood*, 81 M.J. 12, 19–20 (C.A.A.F. 2021).

### 3. Analysis

We disagree with Appellant's claim that trial counsel improperly used personal pronouns by saying, "we know," when describing certain matters. Trial counsel would comment that "we know" some proposition and rhetorically ask, "[H]ow do we know that?" He would then summarize the evidence supporting the proposition. We do not find this style of argument amounts to impermissibly vouching for the evidence, as it is simply one manner of flagging a conclusion then introducing the support for that conclusion. Similarly, references to the victims SrA AS and SrA JK as "our own" were not inappropriate, especially in light of the fact those victims, the parties, Appellant, and all of the members involved in the rehearing were in the Air Force.

Although trial counsel disparaged the Defense's evidence as being "hokum" and "ridiculous," those comments were isolated, infrequent, and limited in scope, such that even if they amounted to error, they did not prejudice Appellant. We decline Appellant's invitation to read these comments as attacks on trial defense counsel; rather, in the context they were made, they were characterizations as to the believability of the evidence. Nonetheless, we do not endorse trial counsel's comments insofar as they may have amounted to impermissible "substantive commentary on the truth or falsity of testimony or evidence." *Fletcher*, 62 M.J. at 180 (quoting *United States v. Washington*, 263 F. Supp. 2d 413, 431 (D. Conn. 2003)).

We find indications that trial counsel accused trial defense counsel personally of making "a blatant mischaracterization" of certain matters and misrepresenting others more concerning. As our superior court has held, it is "improper for a trial counsel to attempt to win favor with the members by maligning defense counsel." *Id.* at 181 (citations omitted). On the one hand, trial counsel made these comments before the Defense's sentencing argument, so such comments could be seen to refer to the overall defense presentation of evidence at the rehearing and their description of the evidence during the opening statement rather than a personal censure of the defense counsel. On the other, such comments could be seen as an attack on trial defense counsel for misrepresenting the facts because the Defense case was weak. We note trial defense counsel did not object, and while perhaps close to the line, we conclude these comments did not amount to plain error, mainly due to the vague manner in which trial counsel made them and the context of his entire argument.

We do find error, however, in trial counsel repeatedly asking the members what their sentence would say about them personally. Trial counsel not only invited the members to consider how they themselves would be seen by others based upon their sentence, he told the members that their sentence would communicate to the victims' families where they stand "as an individual . . . as an Airman." Asking members to consider how they would be judged by others by virtue of the sentence they mete out amounts to "an inflammatory hypothetical scenario with no basis in evidence" and is improper. *Norwood*, 81 M.J. at 21. In *Norwood*, trial counsel asked the members how they—upon returning to their normal duties—would answer questions about what sentence they gave the accused. *Id.* at 19. The CAAF found this comment amounted to prejudicial plain error because it violated the prohibition against threatening court members "with the specter of contempt or ostracism if they reject [trial counsel's] request." *Id.* at 21 (quoting *United States v. Wood*, 40 C.M.R. 3, 9 (C.M.A. 1969)). In Appellant's case, trial counsel specifically placed on the members' shoulders, both personally and professionally, the weight of the victims' families' judgment. Given the lengthy and emotional nature of the rehearing, which many of those family members observed from the courtroom gallery, asking the members to consider what those understandably invested observers would think of them as a result of their sentence was an inappropriate appeal to the members' emotions for an improper purpose. While criminal sentences serve a great number of objectives, sending a message about an individual member's personal threshold for certain types of crimes to victims' relatives is not one of them.

Trial counsel compounded his error by repeatedly asking the members how much risk they would personally accept by virtue of the sentence they adjudged. While Appellant's future risk of misconduct—an issue introduced by the Defense—was an appropriate consideration in fashioning Appellant's sentence, the suggestion that the members would be personally responsible for any such misconduct was not. Although trial counsel could properly ask the members to sentence Appellant in such a way as to specifically deter him from committing future misconduct and to protect society, it was entirely inappropriate to tell the members they would be accepting the risk of a future victim by sentencing Appellant to something less than death. Arriving at a proper sentence tailored to the facts of any case is challenging enough, but injecting capital proceedings with the specter that individual members might be personally responsible for some indeterminate future harm would lead observers to question whether an accused was sentenced based upon his or her actual offenses or upon the members' desire to be free from blame.

Trial counsel did not stop at portraying the members' sentence as reflecting upon them personally—he invoked their professional roles as well by saying their sentence would broadcast where each member stands "as an Airman."

Trial counsel even couched the sentencing process as a once-in-a-career "opportunity" to "draw the line as an individual, and as an Airman on what you will allow[.]" In doing so, trial counsel shifted the members' focus from determining an appropriate sentence for Appellant to using the sentencing proceedings as an opportunity to make individual statements about each member's sense of professional military standards and obligations. We see no proper purpose in injecting such considerations into any court-martial presentencing proceedings, much less into highly visible and intensely scrutinized capital proceedings. Indeed, the considerations seem to have been raised in an effort to have the members think less about determining an appropriate sentence based upon the evidence before them and more about making a public statement about how they would have their sense of personal and professional obligations be judged by others.

Finding error, we turn to the question of prejudice. Trial counsel's entire argument was premised on his singular recommendation that Appellant be sentenced to death. At no point did he discuss the possibility of Appellant receiving anything less, which is to say he did not talk to the members about making a distinction between life with the possibility of parole and life without it. By not sentencing Appellant to death, the members declined to adopt trial counsel's sentencing recommendation. Moreover, by announcing that all members concurred with the sentence of life without eligibility for parole, the panel indicated it was unanimous in rejecting trial counsel's call for the death penalty. In other words, trial counsel's argument did not drive a single panel member to agree with his recommendation. Given this clear rejection, we are hard-pressed to find that trial counsel's improper arguments resonated with the members at all. We further consider the brutal nature of Appellant's offenses, in which his sanguinary attack cut short two young lives and tragically—and potentially permanently—derailed the forward trajectory of another. The impact to the victims' families is as extensive and indelible as Appellant's crimes were senseless and inexcusable. Appellant's case in extenuation and mitigation did not highlight Appellant's ability to integrate back into society, but concentrated on whether he could live an existence in prison without posing a threat to others. Appellant's own trial defense counsel did not make a plea for a sentence including eligibility for parole, which is a strong indication that Appellant's own defense team saw the true debate in the case as being between life and death—not whether parole should be available. Having considered the entirety of this case, we see Appellant's sentencing proceedings in the same light, and we are convinced that even in the absence of trial counsel's improper argument, the members would have adjudged the sentence they did. We therefore decline Appellant's request to reduce his sentence to life with eligibility for parole.

## I. Appellant's Request for Individual Military and Appellate Counsel

Appellant raises two issues with respect to his legal representation. First, he personally asserts the military judge erred in denying his request for a military counsel of his own selection pursuant to Article 38(b)(3)(B), UCMJ, 10 U.S.C. § 838(b)(3)(B), at his rehearing. Second, he asserts through counsel that the Government improperly interfered with his appellate counsel with respect to this post-rehearing appeal.[44]

### 1. Additional Background

#### a. Rehearing Counsel

In March 2017, before his sentencing rehearing began, Appellant requested Mr. Brian Mizer be detailed as his individual military defense counsel (IMDC) for the rehearing. The next day, Appellant moved the military judge to compel Mr. Mizer's appointment, noting that Mr. Mizer had served as Appellant's appellate defense counsel before the CAAF in the hearing which resulted in Appellant's case being returned for new sentencing proceedings. *See Witt*, 75 M.J. at 380.[45] In his IMDC request, Appellant explained he trusted Mr. Mizer and was confident in his legal skills. At the time, Mr. Mizer was a civilian attorney employed as a senior appellate defense counsel in the Air Force's Appellate Defense Division; he was also a traditional reservist in the United States Navy. In his reserve capacity, then-Commander Mizer was assigned as an appellate defense counsel at the United States Court of Military Commission Review.

A few days after Appellant submitted his IMDC request, Mr. Mizer's supervisor sent a memorandum to Appellant's trial defense counsel stating Mr. Mizer was "not reasonably available to serve as IMDC" due to R.C.M. 506(b)(1)(D), which specifically identifies appellate counsel as being categorically unavailable to serve as such. Appellant's motion to compel Mr. Mizer as his IMDC largely focused on the complexities involved in capital litigation and argued his detailed counsel did not have the degree of experience with such cases that Mr. Mizer did. While acknowledging R.C.M. 506 appeared to mandate the conclusion that Mr. Mizer was not reasonably available, trial defense counsel asserted the rule was "illogical and anachronistic." The Government opposed Appellant's motion, pointing to trial defense counsel's collective experience and training, the R.C.M. 506 restriction, and the fact that Mr. Mizer was a civilian employee and not "military counsel"—at least while he was not

---

[44] See Appendix, AOE XII and *Grostefon* issue XVI, respectively.

[45] Mr. Mizer was apparently uninvolved with either Appellant's first appeal to this court or the ensuing reconsideration. *See Witt*, 72 M.J. at 727; *Witt*, 73 M.J. at 738.

on military orders.[46] The military judge denied Appellant's motion, finding that R.C.M. 506 prohibited Mr. Mizer's service as an IMDC due to his employment as an appellate counsel, regardless of his military status.

### b. Appellate Counsel

After the conclusion of his rehearing, Appellant's case was re-docketed with this court on 3 September 2019. At the time, Mr. Mizer had been serving on active duty orders with the Navy since May 2018 and performing counsel duties in one of the military commission cases regarding a detainee at Guantanamo Bay, Cuba. Believing his orders would expire in early March 2020, and that he would then return to his Air Force appellate duties full time as a civilian, Mr. Mizer was assigned to Appellant's appeal before this court. Mr. Mizer's orders did not, however, expire as anticipated. Instead, he was indefinitely recalled to active duty on 10 February 2020 to continue his commission-related duties. Over Appellant's opposition, Mr. Mizer sought to withdraw from Appellant's case on 21 February 2020. In his request, Mr. Mizer noted Mr. Mark Bruegger, also an Air Force senior appellate defense counsel, had been assigned to represent Appellant. Six days later, the Government notified this court it did not oppose Mr. Mizer's request, and we approved his withdrawal on 18 March 2020.[47]

While waiting for his orders to expire, Mr. Mizer requested four enlargements of time to submit assignments of error on Appellant's behalf, signing each in his reserve capacity. These requests—all of which were granted over the Government's objection—extended Appellant's deadline to file his assignments of error from 2 November 2019 to 31 March 2020. The fourth request, which extended the deadline from 1 March 2020 to 31 March 2020, was filed after Mr. Mizer sought permission to withdraw but before the Government responded. None of the requests indicates Mr. Mizer performed any work on the instant appeal; instead, they note Appellant's case would be Mr. Mizer's third priority once he returned to his civilian Air Force position.

---

[46] Shortly after the Government filed its response, the convening authority formally denied Appellant's IMDC request on the grounds that Mr. Mizer was a civilian as well as not reasonably available under both R.C.M. 506 and a related service regulation.

[47] Appellant submitted a sworn declaration from Mr. Mizer regarding his assignment to and subsequent withdrawal from Appellant's appeal. Because the details of Mr. Mizer's role in Appellant's case were captured in Appellant's motions for enlargements of time, our rulings, and Mr. Mizer's request that we permit him to withdraw from the case, we neither rely on Mr. Mizer's post-trial declaration nor decide whether we would be permitted to consider it under our superior court's ruling in *United States v. Jessie*, 79 M.J. 437 (C.A.A.F. 2020).

On 2 June 2020, then-Captain (Capt) Amanda Dermady, Air Force appellate defense counsel, entered a notice of appearance in Appellant's case, and both she and Mr. Bruegger ultimately signed Appellant's assignments of error, which were filed on 15 January 2021. Both Capt Dermady and Mr. Bruegger had other cases they were responsible for resolving before turning their attention to Appellant's case.

### 2. Law

Under Article 38(b)(3)(B), UCMJ, an accused may be represented at trial by a military counsel of his or her own selection, subject to that counsel's availability and applicable regulations. Article 70, UCMJ, which discusses appellate counsel, contains no such provision, and instead directs The Judge Advocate General to detail commissioned officers who shall represent appellants requesting appellate representation. 10 U.S.C. § 870.[48] An appellant also has the right to be represented by a civilian counsel "if provided by" that appellant. Article 70(d), UCMJ, 10 U.S.C. § 870(d).[49]

### 3. Analysis

We have carefully considered Appellant's claim the military judge erred in denying his IMDC request for Mr. Mizer with respect to representation at his rehearing, and we conclude it warrants neither discussion nor relief. *See Matias*, 25 M.J. at 363.

Appellant's claim regarding his appellate representation is that the Government improperly infringed upon his right to appellate representation by involuntarily extending Mr. Mizer's active duty orders, thereby rendering him incapable of assisting with Appellant's case. Appellant acknowledges he has no right to choose his appellate counsel, but he argues Mr. Mizer's expertise "cannot be replicated" and that Capt Dermady and Mr. Bruegger were inadequate substitutes. Notwithstanding this claim, Appellant has not identified any particular appellate issues he was unable to raise, nor does he cite any specific shortcoming of his appellate team. Appellant asserts Mr. Mizer's extension on active duty resulted in Appellant's case being delayed, and that this delay was exacerbated both by Mr. Bruegger's caseload and "the Government's failure to

---

[48] *See also United States v. Patterson*, 46 C.M.R. 157, 161 (C.M.A. 1973); *United States v. Bell*, 29 C.M.R. 122, 125 (C.M.A. 1960).

[49] The constitutional right to trial defense counsel does not extend to appellate proceedings. *Martinez v. Court of Appeal*, 528 U.S. 152, 160 (2000).

properly staff" the appellate defense office.[50] According to Appellant, an appropriate remedy would be the reduction of his sentence to life with eligibility for parole.

An appellant is entitled to competent appellate representation. *United States v. May*, 47 M.J. 478, 481 (C.A.A.F. 1998). Article 70, UCMJ, however, does not vest Appellant with the right to select the attorney to represent him on appeal unless he provides that attorney. The CAAF has suggested The Judge Advocate General may direct the assignment of substitute appellate counsel, at least when the originally assigned counsel "appears to be unresponsive." *United States v. Roach*, 66 M.J. 410, 418 (C.A.A.F. 2008). From this proposition, the Government argues The Judge Advocate General can replace Appellant's appellate counsel "at any time" so long as Appellant is represented. We are not convinced the proposition in *Roach* reaches as far as the Government suggests, because we can easily imagine a case wherein repeatedly replacing an appellant's counsel erodes the quality of the legal representation to the point where an appellant has been denied effective counsel. That, however, is not the case here. Mr. Mizer withdrew from Appellant's case when it became apparent he would be unable to effectively represent Appellant in addition to performing his military duties. Even though one could argue the Government effectively forced Mr. Mizer's withdrawal by virtue of extending his orders, there is no evidence Mr. Mizer performed any work at all on this appeal other than requesting four extensions of time and to withdraw from the case. We recognize Mr. Mizer represented Appellant in his appeal to the CAAF, but that appeal was argued and decided in 2016, prior to Appellant's rehearing which is the subject of the instant appeal. Thus, we see no indication Mr. Mizer's withdrawal from the case rendered Appellant's subsequent representation any less effective. At the most, Appellant's case arguably stalled for the five months' worth of extensions Mr. Mizer sought and received, but any claim of harm arising from that delay is unavailing in light of the fact there is no indication Mr. Mizer intended to start working on Appellant's case until he both returned to his civilian Air Force position *and* completed work on two other cases he was assigned to. If anything, Appellant's case was delayed because Mr. Mizer was assigned to it in the first place, not because he withdrew from it.

Appellant does not argue either Capt Dermady or Mr. Bruegger was unable to competently represent him, instead focusing on his claim that Mr. Mizer has more experience in capital litigation than they do. Even assuming that is

---

[50] We address the delay arising from Mr. Bruegger's caseload and alleged staffing issues in our analysis of Appellant's overarching complaint of delay in Section II(J), *infra*, of this opinion.

true, Appellant was not sentenced to death at his rehearing, so the argument that Appellant's appeal calls for such specific experience has lost its force. Having reviewed the entire record in this case, our assessment of the rehearing is not that it presents novel or complex issues so much as it is voluminous by virtue of the parties' aggressive litigation of nearly every aspect of the case. Appellant's assigned appellate counsel submitted over 200 pages (plus attachments) to this court, covering 23 discrete issues and demonstrating a mastery of not only the record of trial but also the legal issues raised therein.

We further find nothing nefarious with respect to Mr. Mizer's extension on active duty. Appellant contends his case was more deserving of Mr. Mizer's skills than the military commissions, but we decline to substitute our judgment for the military officials tasked with determining how to allocate personnel resources to accomplish specific missions.[51] We note it is not uncommon for military appellate counsel to request to withdraw from cases for any number of reasons flowing from routine aspects of military service, such as reassignments, deployments, and separations. Absent any evidence Mr. Mizer's orders were extended for the purpose of hampering Appellant's appeal, we decline to read anything into the extension beyond our assumption that military authorities concluded Mr. Mizer's service was needed elsewhere.

Thus, we conclude that while Appellant was deprived of his preferred counsel, he had no right to compel the military to afford him that particular attorney. Appellant was provided substitute counsel in accordance with Article 70, UCMJ, and he has not demonstrated he was prejudiced by the substitution. This claimed error warrants no relief.

## J. Post-Trial Delay

Appellant contends he has suffered unreasonable delay in the post-rehearing processing of his case.[52] He points to two specific delays: (1) the period between the end of his rehearing and the convening authority's action, and (2) the period between his case being docketed with this court and our decision.

### 1. Additional Background

The charges against Appellant were originally preferred on 8 July 2004. As detailed earlier in this opinion, Appellant's case took various turns on appeal before eventually being returned for a rehearing on sentence. That rehearing concluded on 6 July 2018, and the convening authority took action on the new

---

[51] In light of Capt Dermady's later appearance, we do not determine whether or not Mr. Mizer's initial assignment to Appellant's case met the requirements of Article 70, UCMJ, which specifically contemplates the detailing of commissioned officers as appellate counsel.

[52] *See* Appendix, AOE XIII.

sentence 392 days later, on 2 August 2019. Because some of the victims' relatives had not been able to provide their input prior to action, the convening authority rescinded this action, obtained that input, provided the victim input to Appellant, allowed Appellant to amend his clemency petition, and took new action on 16 August 2019—406 days after the end of the rehearing.

Appellant's case was docketed with this court 18 days later, on 3 September 2019, which was 424 days after the rehearing concluded. As noted above, Mr. Mizer was assigned to Appellant's case, but he later sought to withdraw on 21 February 2020—a request which we granted on 18 March 2020, 197 days after docketing. Appellant filed his assignments of error on 15 January 2021—500 days after docketing—after requesting and obtaining 14 enlargements of time, all over government objection. Once his assignments were filed, the Government filed its answer 68 days later, on 24 March 2021, after obtaining a single enlargement of time over defense objection. Twenty days later, Appellant filed his reply to the Government's answer. We are now issuing our opinion about 26 and a half months from the date this case was docketed with the court.

All told, once Appellant's rehearing ended, the Government took 492 days to docket the case and answer Appellant's assignments of error; Appellant took 520 days to file his assignments and reply brief; and we took just under 225 days to deliver our opinion. For context, since charges were originally preferred in this case, about 6,350 days—that is, 17 years and 4 months—have passed.

The record for the rehearing alone spans 53 volumes with a transcript nearly 5,000 pages long. With the prior court-martial proceedings attached, the record of trial swells to 98 volumes with 773 appellate exhibits, 106 prosecution exhibits, and 60 defense exhibits. The record further includes numerous discs containing digital evidence, various sealed items, and audio recordings. Multiple court reporters were involved transcribing the proceedings and preparing the record. Based upon chronologies prepared by the court reporters, the rehearing court proceedings were transcribed, reviewed, and coordinated in stages, from late March 2018 through the middle of March 2019.[53] In other words, the transcription was completed about eight and a half months after

---

[53] The Government's answer and Appellant's reply brief both reference chronologies prepared by court reporters which were included in the record of trial docketed with our court. The parties have not taken a position as to whether these chronologies are part of the "record" as defined in R.C.M. 1103(b)(2), matters "attached to the record" as defined in R.C.M. 1103(b)(3), matters that we may consider because both parties have referenced them in their briefs, without objection, or something we may not consider on appeal under *Jessie*, 79 M.J. at 440–41. We assume without deciding that we may consider the chronologies, as neither party objected to them at any point. *See United States v. Stanton*, 80 M.J. 415, 417 n.2 (C.A.A.F. 2021).

the rehearing concluded. While this was being done, the court reporters assigned to Appellant's case performed court-reporting duties for other courts-martial and hearings they were detailed to. The remainder of the post-trial processing was finished in the following five months, which at a minimum included: compiling, reproducing, and distributing the record; completing the staff judge advocate's review; receiving and reviewing both victim input and Appellant's clemency submission; preparing an addendum to the staff judge advocate's recommendation; and obtaining convening authority action.

Throughout the processing of this case, Appellant asserted his right to speedy post-trial processing, although once his case was docketed with this court, he agreed to his counsel's requests for enlargements of time to file his assignments of error and reply brief.

### 2. Law

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *Moreno*, 63 M.J. at 135 (first citing *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004); and then citing *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). In *Moreno*, the CAAF established a presumption of facially unreasonable delay when the convening authority does not take action within 120 days of sentencing, and when the Court of Criminal Appeals does not render a decision within 18 months of docketing. 63 M.J. at 142. Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (first citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); and then citing *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533).

Where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is "so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an Appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted).

### 3. Analysis

Both periods of delay cited by Appellant—from sentencing to action and from docketing to our opinion—are facially unreasonable under *Moreno*. The first period's standard is 120 days, and 406 days elapsed here. The second period's standard is 18 months, and 26 months have elapsed.

#### *a. Sentence to Action*

The period between sentencing and convening authority action was more than triple the standard, but the overarching reason for this is apparent from the sheer size of the record in this capital murder trial—which had already traveled through this court to our superior court and back to the convening authority for new proceedings. The rehearing, which only pertained to sentencing, was so comprehensively litigated that it resulted in nearly 5,000 pages of trial transcript—a size rarely seen by our court even for proceedings including findings and sentencing. Because the record must include prior proceedings, the entire record is now nearly 100 volumes.

Approximately 250 days were spent by various court reporters simply transcribing the proceedings of Appellant's rehearing, which took place over 35 different days spread over a year and a half. From their chronologies, we see the reporters would complete segments of the transcription, then send those to the parties and later to the military judge for review. By staging the transcription coordination process in this manner, the court reporters were able to avoid a significant delay at the tail end of the transcription process by not electing to simply provide the parties and the military judge with the entire complete transcript at once for their respective reviews. Appellant suggests court reporters should have been exclusively detailed to Appellant's case and relieved of their existing caseloads, but such an extraordinary move would have resulted in other appellants suffering delays in their cases after the reallocation of limited court-reporting resources.

In the following five months, the staff judge advocate had to review the entire case in order to prepare his written recommendation and then consider Appellant's comprehensively detailed clemency submission. We note that two weeks of this time involved the late submission of victim inputs with the resulting withdrawal of the convening authority's action and Appellant's amendment of his clemency petition. However, we view the relatively short additional delay in order to ensure both that the victims were reasonably heard and that Appellant had the opportunity to respond to be an appropriate reason for extending the processing period.

We also considered how the size of Appellant's record of trial compares to the 120-day *Moreno* standard when that standard is applied to the size of a record we more commonly see. A typical "large" record reviewed by this court

averages approximately 10 volumes. Applying the 120-day *Moreno* standard to a record of that size yields a processing rate of 12 days per volume before the processing time becomes facially unreasonable. Considering the processing of Appellant's rehearing record took 406 days and involved 53 volumes, the rate in this case works out to less than eight days per volume. Thus, Appellant's case was processed at a speed notably quicker than the speed allotted before a typical large case's processing time becomes facially unreasonable. We acknowledge 406 days is a lengthy period of time to execute what are generally administrative processing tasks, but we also recognize that not all cases are the same. When compared to more typical cases, we conclude the rate at which Appellant's case was processed does not indicate any dilatory conduct on the Government's behalf.

Appellant did assert his right to speedy post-trial processing at various points between his sentence being adjudged and action being taken. He, however, has not shown the delay during this period has prejudiced any of the interests cited by the CAAF in *Moreno*. Appellant seems to suggest the post-trial processing delay resulted in him losing out on Mr. Mizer's assistance, however, the evidence does not support such a claim. Mr. Mizer had been on active duty orders since before Appellant's rehearing concluded, and he remained on such orders through his eventual withdrawal. Other than submit requests for enlargements of time and his eventual withdrawal, Mr. Mizer does not appear to have performed any substantive work on Appellant's case. All of which is to say that even if Appellant's post-trial processing had been completed instantaneously, Appellant still would not have had the benefit of Mr. Mizer's assistance because Mr. Mizer was never released from his active duty obligations during the time periods relevant to Appellant's post-rehearing appeal.

Appellant has not alleged he has suffered from oppressive incarceration; he has not asked for a rehearing and we are not granting him one on our own accord; he has not asserted any grounds for appeal have been impaired. Although we recognize the extraordinary length of time that has elapsed since charges were first preferred in his case, Appellant has not demonstrated the delay during the period discussed here has operated to impose anxiety and concern. We do not minimize the deprivations inherent in being incarcerated, but our review of the record leads us to conclude much of Appellant's reasons for anxiety and concern were lifted once he was removed from death row and even more so once the members at his rehearing determined he would no longer face the death penalty. In addition, Appellant's convictions ensured he would be sentenced to life in prison; thus, the only available modification to the sentence he faced at this stage would have been to grant him eligibility for parole—a modification which, even if we directed it, would have not likely resulted in any change to Appellant's confinement situation during the 406-day period at issue here. We have also considered whether—in the absence of any

cognizable prejudice—the delay in this case was so egregious as to adversely affect the public's perception of the fairness and integrity of the military justice system and thereby amount to a violation of Appellant's due process rights, and we conclude it was not.

### b. Docketing to Opinion

In producing this opinion, we exceeded the 18-month standard by eight and a half months. We again highlight the size and complexity of the record in this case as well as the number and breadth of issues raised by Appellant resulting in a lengthy opinion from the court. While this total period lasted just over 800 days, a full 520 of those days are attributed to Appellant filing his assignments of error and his reply brief, largely due to delays his counsel sought on his behalf. Even if we subtracted the 171 days Mr. Mizer was assigned to Appellant's case from the date of docketing to the date he sought to withdraw, 349 days of the period would still be pursuant to Appellant's submissions. By comparison, the Government took 68 days for its answer, and we took just under 225 days to produce our opinion. Appellant contends that if the appellate defense office had been more robustly staffed, he would have been able to file his assignments of error sooner under the theory he could have been assigned counsel who were not already encumbered with significant caseloads. That very well may be true, but it was the appellate defense office which assigned Mr. Mizer to Appellant's case even though he was not expected to return to his appellate duties for a full six months following the docketing of Appellant's case. We will not second-guess that office's selection of Appellant's attorneys, nor will we attribute such delay to the Government under the facts presented here.

For the reasons noted above related to the period of post-trial processing, we conclude Appellant has likewise not shown prejudice warranting relief for the period between docketing and this opinion, nor has he demonstrated delay with respect to the processing and review of this rehearing to the degree it would adversely affect the public's perception of the military justice system.

### c. Relief Under Article 66(c), UCMJ

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), and the particular facts presented by Appellant's case, we conclude it is not.

### III. CONCLUSION

The findings of guilty with respect to the specifications and the charges were previously affirmed by this court. The sentence adjudged by the court-martial and approved by the convening authority is correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the approved findings and sentence are **AFFIRMED**.[54]

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[54] The court-martial order in this case incorrectly indicates Appellant was sentenced by a military judge when he was, in fact, sentenced by members. The order also omits the reprimand which the members adjudged and which the convening authority specified in his action. We direct the publication of a corrected court-martial order to remedy these errors.

**Appendix**

**Assignments of error raised by Appellant through appellate counsel:**

I.

WHETHER THE MILITARY JUDGE ERRED BY FAILING TO SET ASIDE THE CAPITAL INSTRUCTION DUE TO THE OVERBREADTH OF R.C.M. 1004?

II.

WHETHER THE MILITARY JUDGE ERRED BY FAILING TO SET ASIDE THE CAPITAL INSTRUCTION DUE TO THE GOVERNMENT'S FAILURE TO REFER THE AGGRAVATING FACTORS?

III.

WHETHER THE MILITARY JUDGE ERRED BY FAILING TO SET ASIDE THE CAPITAL INSTRUCTION DUE TO THE IMPROPER DELEGATION OF R.C.M. 1004 TO THE PRESIDENT OF THE UNITED STATES?

IV.

WHETHER THE MILITARY JUDGE ERRED BY FAILING TO SET ASIDE THE CAPITAL INSTRUCTION DUE TO THE DEATH PENALTY VIOLATING THE EIGHTH AMENDMENT AND ARTICLE 55, UCMJ?

V.

WHETHER THE MILITARY JUDGE ERRED BY NOT GRANTING THE DEFENSE'S CHALLENGES FOR CAUSE AGAINST SENIOR MASTER SERGEANTS AK AND ML, AND MASTER SERGEANT SC?

VI.

WHETHER TRIAL COUNSEL COMMITTED PROSECUTORIAL MISCONDUCT BY ASKING "ARE YOU AWARE" TYPE QUESTIONS WITHOUT POSSESSING A GOOD FAITH BASIS REGARDING THE UNDERLYING ALLEGATIONS?

VII.

WHETHER THE MILITARY JUDGE ERRED BY ALLOWING THE GOVERNMENT TO UNDERMINE THE DEFENSE'S CASE THROUGH ITS REFERENCES TO AN UNAUTHORIZED AND UNOFFICIAL RISK ASSESSMENT REPORT THAT A GOVERNMENT EMPLOYEE PROVIDED TO THE DEFENSE AND WHICH THE DEFENSE, IN GOOD FAITH, BELIEVED WAS LEGITIMATE?

VIII.

WHETHER THE MILITARY JUDGE ERRED BY ALLOWING THE GOVERNMENT TO ADMIT EVIDENCE OF [APPELLANT'S] PURPORTED REMOVAL OF JS'S SKIRT AND

BY INSTRUCTING THE PANEL MEMBERS THAT THE REMOVAL OF JS'S SKIRT WAS AN AGGRAVATING FACTOR?

IX.

WHETHER THE MILITARY JUDGE ERRED BY PERMITTING THE GOVERNMENT TO PUBLISH EVIDENCE TO THE PANEL THAT WAS NOT PROPERLY ADMITTED?

X.

WHETHER TRIAL COUNSEL COMMITTED PROSECUTORIAL MISCONDUCT BY USING PERSONAL PRONOUNS TO ALIGN HIMSELF WITH THE PANEL, OFFERING PERSONAL VIEWS ON THE EVIDENCE, MALIGNING DEFENSE COUNSEL AND THE DEFENSE THEORIES, AND INFLAMING THE PASSIONS OF THE PANEL BY REPEATEDLY ASKING THEM "WHAT WILL YOU STAND FOR," "WHERE WILL YOU DRAW THE LINE," AND "IF NOT NOW, THEN WHEN," OR WORDS TO THAT EFFECT?

XI.

WHETHER THE GENERAL COURT-MARTIAL ORDER IS INCORRECT?

XII.

WHETHER THE GOVERNMENT IMPROPERLY INTERFERED WITH [APPELLANT'S] ATTORNEY-CLIENT RELATIONSHIP BY INVOLUNTARILY RECALLING TO ACTIVE DUTY HIS CIVILIAN APPELLATE DEFENSE COUNSEL?

XIII.

WHETHER [APPELLANT] IS ENTITLED TO SENTENCE APPROPRIATENESS RELIEF RESULTING FROM THE GOVERNMENT'S POST-TRIAL DELAY?

XIV.

WHETHER THE CUMULATIVE EFFECT OF THE ERRORS IN [APPELLANT'S] CASE DENIED HIM A FAIR REHEARING?

**Issues personally raised by Appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982):**

XV.

TWO MONTHS PRIOR TO THE REFERRAL OF [APPELLANT'S] SENTENCE REHEARING, THE GOVERNMENT—THROUGH ITS REPRESENTATVE, GB— INFORMED THE VICTIMS' FAMILIES THAT THE CASE WOULD BE REFERRED CAPITALLY. DID THE GOVERNMENT'S PRIOR KNOWLEDGE OF THE CAPITAL REFERRAL DEMONSTRATE THAT EITHER THE CONVENING AUTHORITY HAD ALREADY PREDETERMINED HE WOULD REFER THE CASE CAPITALLY, OR WAS UNLAWFULLY INFLUENCED BY GOVERNMENT PRESSURE?

XVI.

WHETHER THE GOVERNMENT IMPROPERLY DENIED [APPELLANT'S] REQUEST
FOR INDIVIDUAL MILITARY DEFENSE COUNSEL?

XVII.

WHETHER THE GOVERNMENT IMPROPERLY DENIED [APPELLANT'S] REQUEST
FOR LEARNED COUNSEL?

XVIII.

WHETHER THE MILITARY JUDGE ERRED BY IMPROPERLY REHABBING
POTENTIAL PANEL MEMBERS DURING VOIR DIRE?

XIX.

WHETHER THE MILITARY JUDGE ERRED BY FAILING TO GRANT THE DEFENSE
ADDITIONAL PEREMPTORY CHALLENGES?

XX.

WHETHER TRIAL COUNSEL COMMITTED PROSECUTORIAL MISCONDUCT BY
FAILING TO TIMELY DISCLOSE THE USE OF ITS EXPERT FOR VOIR DIRE?

XXI.

WHETHER THE MILITARY JUDGE ERRED BY ALLOWING TRIAL COUNSEL TO ASK
IMPROPER AND UNTIMELY SUBMITTED QUESTIONS DURING VOIR DIRE?

XXII.

WHETHER THE MILITARY JUDGE ERRED BY ALLOWING TRIAL COUNSEL TO ASK
COLONEL SM ABOUT A LETTER THAT [APPELLANT] PURPORTEDLY WROTE, BUT
NEVER SENT, TO A PARAMOUR?

XXIII.

WHETHER THE MILITARY JUDGE ERRED BY DECLINING TO PROVIDE VARIOUS
DEFENSE-REQUESTED INSTRUCTIONS?